REL–REEVES, INC., successor to Dynamics Corporation of America

v.

The UNITED STATES

v.

DIGITAL RESOURCES CORPORATION, Third-Party Defendant.

No. 258–67.

United States Court of Claims.

April 14, 1976.

recommended decision, as hereinafter set forth,* it hereby affirms and adopts the same as the basis for its judgment in this case. It is therefore concluded that claims 7, 8 and 13 of United States Letters Patent No. 2,967,997 are valid and have been used and/or manufactured by or for defendant, without authorization or license from plaintiff and that plaintiff is entitled to recover reasonable and entire compensation therefor. Accordingly, judgment is entered for plaintiff to that effect with the amount of plaintiff's recovery to be determined pursuant to Rule 131(c)(2).

## OPINION OF TRIAL JUDGE

COLAIANNI, Trial Judge:

Plaintiff, Rel-Reeves, Inc., seeks reasonable and entire compensation under 28 U.S.C. § 1498 for unauthorized use by the Government of its patented invention. The issue of liability is the only one presently before the court. An accounting trial, if it becomes necessary, will be held after the issue of liability has been finally adjudicated.

The patent in suit, United States Letters Patent No. 2,967,997 (hereinafter referred to as the "McCoy" patent), issued on January 10, 1961, on an invention entitled, "Method and Apparatus for Checking Electronic Analog Computers." All rights in the patent were assigned by Rawley D. McCoy, the inventor, to Reeves Instrument Corp. As a result of a series of mergers and sales, the patent in suit and all claims thereunder, including the present suit, are now owned by Rel-Reeves, Inc.

Although defendant's answer and amended answer originally contested the validity of the McCoy patent, validity no longer is an issue. In defendant's own words:

> The issue of validity of these claims [7, 8 and 13] is no longer contested by the Government in view of the settlements in related patent suits brought by plaintiff against two of the Government's indem-

Thomas P. Dowling, New York City, for plaintiff. George B. Finnegan, Jr., New York City, attorney of record. Kurt E. Richter, New York City, of counsel.

Ronald Snider, Washington, D. C., with whom was Asst. Atty. Gen. Rex E. Lee, Washington, D. C., for defendant. W. Boswell Childs, Washington, D. C., of counsel.

Michael P. Breston, Houston, Tex., attorney of record, for third-party defendant.

Before DAVIS, NICHOLS and BENNETT, Judges.

## OPINION

PER CURIAM:

This case comes before the court on defendant's exceptions to the recommended decision of Trial Judge Joseph V. Colaianni, filed April 30, 1975, pursuant to Rule 134(h), having been submitted on the briefs and oral argument of counsel for plaintiff and defendant. Upon consideration thereof, since the court agrees with the trial judge's

---

* Whereas the court adopts the trial judge's separate findings of fact which are set forth in his report filed April 30, 1975, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

nifying suppliers of accused computers. Beckman Instruments, Inc. * * * and Electronic Associates, Inc. * * *. The issue of validity was fully litigated in *Reeves Instrument Corporation et al. v. Beckman Instruments Inc.*, 161 USPQ 450 (C.D.Cal.1968), affirmed, 444 F.2d 263, 170 U.S.P.Q. 74 (C.A.9th, 1971), cert. denied 404 U.S. 951 [92 S.Ct. 283, 30 L.Ed.2d 268] (1971).

Defendant, accordingly, now bases its defense against plaintiff's charge of infringement on: (1) the existence of either an express or implied license under the McCoy patent; and (2) the argument that the claims at issue should be narrowly construed to prevent them from covering the apparatus procured and/or used by it. Defendant thus urges that the following issues are to be resolved by this court:

(a) Whether the terms of Navy Contract NOas 52–1142–c granted the United States a royalty-free license to practice the "problem check" improvement covered by the McCoy patent;

(b) Whether the United States is entitled to a royalty-free, express license under the "subject invention" clause of Navy Contract NOas 54–545–c;

(c) Whether the plaintiff should be equitably estopped to deny the United States has an implied royalty-free license in the McCoy patent; and

(d) Whether, upon failing to find that defendant has established either an express or implied license, claims 7, 8 and 13 of the McCoy patent should be narrowly construed to cover only the "first-order loops" of analog computers.

For reasons hereinafter set forth, it is concluded that the patent is valid and the inventions covered by claims 7, 8 and 13 have been used and/or manufactured by or for defendant without authorization or license from plaintiff.

*Background*

The patent in suit relates to a method and apparatus for checking electronic analog computers. The patent discloses and claims both a "dynamic" and "static" checking apparatus; however, the claims at bar, Nos. 7, 8 and 13, are only directed to static checks.

The importance of electronic computers as design tools was recognized at least as early as the April 20, 1955, filing date of the McCoy patent, and the accuracy of electronic computers even at that early date was sufficiently high to encourage such use. While both digital and analog computers were popular and in wide use in the mid-1950's, the McCoy patent is useful only to check components and connections of electronic analog computers. Analog computers, as distinguished from digital computers, employ distinct computing elements for each mathematical operation required to reach the solution of a given problem. The computing elements, or computer variables, are made to obey mathematical relations analogous to the variables of the original problem, and recordings, or measurements, of the behavior of the computer elements provide the solutions to the problem under study.

The variables of the analog computer described in the McCoy patent are represented by d.c. voltages that vary with time. The principal computing elements in such a computer is a d.c. amplifier with a capacitive feedback network, otherwise known as an integrator circuit. Moreover, analog computers are broadly classified as specialized (limited purpose) or general purpose types. General and specialized d.c. analog computers utilize similar machine elements. However, while in specialized computers, the elements are prewired in a fixed-circuit relationship, the computing elements of general purpose computers can be easily rearranged by means of patchcords. Problem parameters are established by the use of adjustable potentiometers or rheostats.

However, the flexibility achieved in a general purpose analog computer by the use of patchcords and adjustable potentiometers makes it vulnerable to the introduction of human error. In addition to its susceptibility to "human" error, errors can also

occur because of the malfunctioning of one or more of the many computer components.

In order to increase confidence in the validity of computer solutions, various testing procedures were resorted to by operators of general purpose analog computers. Each of the prior art testing procedures has been found to be deficient for a number of reasons, including the significant number of hours needed to run such tests, the high costs involved to conduct the tests, and the fact that the tests disturbed the patchcord connections and/or potentiometer settings. The McCoy patent, as the following quotation indicates, see col. 1, lines 36 to 52, was directed at overcoming these important prior art limitations in the testing of electronic analog computers:

> Electronic computers are recognized today as being indispensable tools in the field of Dynamic Systems Engineering. Generally speaking, present day electronic computers have excellent accuracy, but this accuracy is meaningful only if the computer setup which includes problem coding, patch connections and scale factor potentiometer settings are free from error and the components of the computer are operating properly. In setting up a computer for the solution of a particular problem, several hundred or more connections and settings may have to be made by the operator and there is always the possibility of human error in addition to the possibility of improper operation of the components in the computer. Hence it is of the utmost importance to be able to check the operation of the computer after it has been set up for the solution of a particular problem in order to establish the validity of the results obtained.

The patent in suit teaches how, through the incorporation of switching relays and appropriate voltage sources within the circuit of each integrator of an analog computer, the connections between the computer components, as well as the proper operation of the components themselves, may be tested. The incorporation of the relays, their associated circuits, and voltages into the integrators eliminated the necessity for an operator to manually modify the connections and settings of the computer both before and after a testing operation. Particularly, the claims at bar disclose and cover a structural combination which is capable of statically testing all components except the integrator capacitors of an analog computer.

The patent in suit, see fig. 1 which is reproduced at finding 38, shows the computer setup required to solve a relatively simple missile trajectory problem. The problem setup includes integrators 10 and 16. Fig. 1 shows the existence of a number of computation loops associated with each of the integrators. As shown, one loop comprises integrator 16, electronic multiplier 18, and potentiometer 20. Another loop includes integrator 10, resolver-servo 12, amplifier 15, the amplifier portion 22 of division unit 19, amplifier 23, and potentiometer 24. In addition, fig. 1 discloses what is commonly referred to as a "second-order loop," because of the inclusion of both integrators 10 and 16, and consists of integrator 10, resolver-servo unit 12, amplifier 14, integrator 16, potentiometer 17, division unit 19, inverting amplifier 23, and potentiometer 24. It is not unusual for a problem to include single integrator loops, loops including two or more integrators, and, as well, loops having no integrators.

Fig. 2 of the McCoy patent, at finding 39, shows a typical integrator circuit with its associated input resistor network, and, as well, the switching networks and voltage sources needed to carry out the patented McCoy invention. While each integrator of the computer will be modified in a similar fashion, only one integrator is shown in fig. 2 for purposes of illustration. Inputs to the integrators are made by way of the input resistor network and associated patchcord connections thereto.

The data flow shown in fig. 1 occurs when the computer is in the "compute" or "operate" mode. However, before the computer is placed in this mode, it is switched to an "initial condition" or "reset" mode. As explained in detail by finding 40, during the "initial condition" mode, the summing

junction 29 of fig. 2 is grounded and the computing loops associated with each integrator are opened and each integrator is disabled by connecting a resistor (41 of fig. 2) across integrating capacitor 40. The initial condition voltages which represent the values of the variables at the start of a computation cycle are introduced into the appropriate integrators. These initial condition voltages are disconnected during the problem checking operation and are not used as test voltages during that operation.

After the computer has been set up to solve a particular problem and before initiating the "compute" operation, it is customary to conduct a check of the computer's static elements. As explained by the patent in suit, during problem check, the X and P.C. relays, as shown in fig. 2, are energized and the Y relay is de-energized. As a result, the integrator is converted into a negative feedback amplifier, the connection of the resistor network to the input of the integrator remains undisturbed, and the integrator output (lead 48) which normally is connected to other computing elements is connected to a source of predetermined test voltage.

The test voltage is translated through various computing elements, multipliers, potentiometers, resolvers, etc., which are connected to the output of the integrator. In this arrangement, the operator can obtain voltage readings at various points in the computer, including the summing junction, and by comparing these voltages with precalculated theoretical voltages for the same test points, determine whether the various computer components and connections are operating properly.

In operation, a test voltage is fed, by way of closed loops formed by the other computing elements and the input resistors, to the terminals of each integrator circuit. (See PX 409 accompanying finding 41.) The test voltage then flows through the negative-feedback amplifier 39 to an appropriate voltage measuring device 64.

Since the output leads, which normally carry the signals from each of the integrators to other parts of the computer have been opened, it should be emphasized that the test voltages are only capable of flowing from the output of an integrator, through various computer elements in closed-loop association, to the input terminal of the same integrator. Accordingly, as plaintiff admits, the McCoy invention cannot test open-loop sections, loops that are open in the computation mode, or second and higher-order loops (loops having two or more integrators) of computer setups where there is no shunt path around the additional integrators in such loops which would permit the test voltage to return to the input terminal of an integrator.

In the problem check mode described, the initial derivative signals are transmitted through the input resistor network to the summing junction and passed by the negative feedback amplifier to an appropriate voltage reading device. The patented invention thus permits the checking of various computing elements, including the patch connections to the integrators, the associated patchbay contacts, and the input circuits of the integrators, which consist of the input resistors and the connections to the summing junction.

### The Patent Claims

Plaintiff urges that claims 7, 8 and 13 of McCoy are infringed by defendant. While each of the claims are discussed in considerable detail in the findings of fact, for purposes of illustration only, claim 13, the narrowest of the claims at bar, is reproduced in indented form to aid in the identification of its major sections:

(a) Apparatus for testing an analog computer including at least one integrating circuit, * * *

(b) * * * said integrating circuit having an input coupled to first terminal means of the remaining elements of the computer and an output coupled to second terminal means of the remaining elements of the computer to form a closed-loop system, the input of said integrating circuit including a series input resistor, * * *

(c) * * * comprising in combination, means including switching means coupled to said integrating circuit, ˙ * *

(d) * * * a source of known voltage coupled to said switching means, * *

(e) * * * said switching means rendering said integrating circuit ineffective * * *

(f) * * * and supplying a known voltage to said second terminal means of the computer, * * *

(g) * * * said known voltage being translated through the remaining elements of the computer to the series input resistor of said integrating circuit, * *

(h) * * * and measuring means including amplifier means coupled to said series input resistor for measuring the response of the remaining elements of the computer to said known voltage.

### File Wrapper Estoppel

Defendant contends that during the prosecution of its application, plaintiff modified its claims to read on checking circuits that are broader than the McCoy invention. Particularly, defendant argues that the original claims were all limited to " * * * disconnecting the output of the integrator, substituting a 'problem check' voltage for the output, and measuring the output of the disabled integrator." However, defendant charges that by amendment of October 1, 1956, plaintiff added claims that eventually matured into patent claims 7 and 8 and for the first time omitted the limitation that called for the problem check measurement to be made at the output of the integrator amplifier. As further support for its position, defendant points to a memorandum written by the agent prosecuting the application through the Patent Office. That memo states:

I would like to draw a set of broad claims if this is possible which will cover not only our own Problem Check invention, but the problem check systems of our competitors.

Defendant thus argues that the purpose of omitting the claim limitation which required that the problem check measurement be made at the output of the integrator, was to—

* * * preempt a class of checking circuits for analog computers whose principles, structure, design, approach, components, and operation are different from McCoy's invention.

- ▮ Defendant's arguments find no support in the record and thus must be rejected. To begin, it is not unusual for an applicant to modify pending claims. Indeed, it has long been established that claims may be amended to assure complete protection for what applicant originally intended to reserve for himself and to make express what amounts to nothing more than an equivalent of the original disclosure and claims. *Jones v. Sears, Roebuck & Co.*, 187 F.Supp. 293, 127 USPQ 411 (D.Col.1960), *aff'd*, 308 F.2d 705 (10th Cir. 1962), *cert. denied*, 371 U.S. 952, 83 S.Ct. 509, 9 L.Ed.2d 501 (1963).

As explained in findings 50–64, the drawings and specification as originally filed clearly required that voltage readings be made at various points of each integrator loop, including the summing junction. More particularly, col. 4, lines 56–70, states:

After the computer has been connected with the proper settings for the computation of a particular problem, a static problem check is first carried out. Under such conditions, the relay P.C. is energized and a constant problem check voltage from the potentiometer 53 is substituted in the computer for the output of the integrator. The relay X is also energized and thus, the amplifier does not function as an integrator. This is done for each integrator in the computer and with the introduction of these constant voltages, output voltages will appear at each component in the computer, the values of which may be read and recorded by the read-out device. *Under these conditions, the outputs of the integrators will be proportional to the initial value of the*

*derivatives applied thereto.* [Emphasis added.]

In order for the outputs of the integrators to be proportional to their input signals, it is necessary that the "initial value of the derivatives" (the input to the integrators) find their way from the input resistor network to the summing junction, through the amplifier to the output terminals of the integrators. This was explained by McCoy to the Patent Office in the amendment of May 12, 1958, wherein he states:

[I]n the static test of an analog computer, the integrator is disabled, and it is the input voltage at the input of the "disabled" integrator that is to be measured. Nevertheless, while it is the input voltage to the "disabled" integrator that is to be measured, the connection of the digital converter [voltage reading and recording device] 64 remains unchanged [remains connected to read the voltage at the output lead of the "disabled" integrator].

With the understanding that by measuring the output of the converted integrator, McCoy in fact is teaching and accomplishing a measurement of the amplified initial derivative signals which appear at the input of the integrator, it is concluded that plaintiff has from the filing of his application sought to patent the structural combination covered by claims 7, 8 and 13.

Moreover, defendant's charge that plaintiff's amendments were improperly motivated in order to cover the later developments of competitors is equally unpersuasive in view of plaintiff's continuous attempt to claim the inventions covered by claims 7, 8 and 13. In a review of a strikingly similar set of accusations and circumstances, the Southern District Court of Florida has stated:

There is nothing inherently wrong or dishonest in amending claims in a pending application during the course of prosecution before the United States Patent Office in order to insure that the claims which ultimately appear in the issued patent will cover the commercial activity of third parties, whose potentially infringing activities are discovered subsequent to the filing of a patent application, so long as the claims are supported by the original patent application disclosure. Thus, whether or not * * * [patentee] was spurred into making broader claims in his then pending application by the appearance of the * * * [accused infringers'] publication is irrelevant; and the only legitimate issue of fact or law is whether [the] claims * * are supported by the original disclosure of the * * * application * * *. [359 F.Supp. at 954–55.][1]

Equally unmeritorious is defendant's contention that false and misleading statements were made to the Patent Office examiner during the prosecution of the McCoy application that limited the claims in suit to the circuit specifically illustrated in the drawings. Defendant particularly complains that the October 1, 1956, amendment which added application claims 15 and 16 (patent claims 7 and 8)—

(1) for the first time recited that the input to the integrators was to be measured; and

---

1. *Penn Yan Boats, Inc. v. Sea Lark Boats, Inc.*, 359 F.Supp. 948, 175 USPQ 260, 264 (S.D.Fla. 1972), *aff'd per curiam*, 479 F.2d 1328, 178 USPQ 577. *See also Pursche v. Atlas Scraper and Eng.*, 300 F.2d 467, 476–77 (9th Cir. 1961), 132 USPQ 104, 111–12, *cert. denied*, 371 U.S. 911, 83 S.Ct. 251, 9 L.Ed.2d 170 (1962), the court stated:

"Nor do any of the remaining attacks on these two claims have merit. Under the doctrine of 'late claiming' as exemplified in such cases as *Muncie Gear Works v. Outboard Marine & Mfg. Co.*, 315 U.S. 759, 62 S.Ct. 865, 86 L.Ed. 1171 (1942), a supplemental claim adding new matter to a pending patent application is invalid where intervening use or sale of a device described in the supplemental claim occurred more than one year prior to the filing of that claim. 35 U.S.C.A. § 102(b). It is true that in this case the 090 plow had been in public use for nearly four years before Pursche supplemented his pending patent application with claim 27. But the scope of the invention stated in several claims initially made in that application extended to and included the matter covered in claim 27. Claim 27 added nothing new to the application."

(2) for the first time added the limitation of closed feedback loops.

These arguments have in part previously been treated and it, therefore, is only necessary at this point to discuss defendant's contention regarding the added closed-feedback loop limitation. A review of the specification, drawing and claims as filed makes it abundantly clear that in carrying out the problem check operation McCoy intended to open the output lead (48) that connected each of the integrators with the rest of the computer, *see* fig. 2 of the patent. However, at the same time, the test voltage from potentiometer 53 was to be " * * * substituted in the computer for the output of the integrator." (Col. 4, lines 60–61 of the McCoy patent.) This test voltage was then translated through the circuit components connected to the output terminals of each of the integrators. Moreover, in order for the " * * * outputs of the integrators * * * [to] be proportional to the initial value of the derivatives applied thereto * * * " (Col. 4, lines 69–70), it is necessary, as previously explained, for the test voltages to eventually find their way back to the input terminals of each of the integrators. This is obviously only possible if closed loops between the output and input terminals of each of the integrators exist.

It is thus concluded that plaintiff intended, from the filing of its application, to cover a combination which included closed-feedback loops. The language of claims 7 and 8 (application claims 15 and 16) did nothing more than expressly state what must be regarded as an equivalent of plaintiff's original disclosure and claims.

In addition, defendant urges that by the October 14, 1959, amendment the claims in suit were—

* * * clearly limited * * * to circuits in which the test voltage is applied *in place of* the integrator circuit. Applicant thereby excluded from coverage circuits like those in Korn & Korn [*see* figure accompanying finding 67] in which the integrator *cannot* be removed during a static check and in which the static test voltage is applied at the initial condition terminals on the input side of the integrator.

After careful consideration, defendant's argument is found to be unconvincing and must also be rejected. The Korn & Korn prior art disclosed and taught the insertion of an initial condition voltage source at the integrator input, while at the same time requiring that the input resistor network be disconnected. Accordingly, the reference did not disclose a system which was capable of testing the input resistors and associated patchcord connections.

In commenting on the disadvantages of the Korn & Korn circuit over the McCoy invention, the Circuit Court stated in the case of *Reeves Instrument Corp. v. Beckman Instruments, Inc.*, 161 USPQ 450 (C.D. Cal.1968), *aff'd*, 444 F.2d 263, 267–68, 170 USPQ 74, 78 (9th Cir. 1971), *cert. denied*, 404 U.S. 951, 92 S.Ct. 283, 30 L.Ed.2d 268 (1971):

It was established at trial that certain aspects of an analog computer could be checked by applying the initial condition voltage as set forth above and then making certain measurements within the loop (which is open at the input to each integrator) prior to de-energizing the relay and proceeding with the desired computation. It was, however, equally established that this approach to checking had two substantial disadvantages.

The first disadvantage to this approach stems from the fact that not all integrators in a given problem will require an initial condition voltage so that, in order to check the circuitry associated with these integrators, it would be necessary to establish some initial condition voltage for checking purposes. This voltage would, however, have to be removed prior to running the problem. The chance that the computer operator might forget to remove these checking voltages adds an extra source of possible human error into the system.

The second disadvantage to this approach stems from the fact that it can check only limited portions of the loop.

Particularly troublesome is the fact that it was not possible to check the crucial connections on the patch board which connect the input resistors to the integrators nor was it possible to check the integrator summing junctions since the loop is opened at the *input* to each integrator.

In sum, this check was incomplete and, as found by the district court, caused "a disturbance of the problem set-up and an aggravation of the human error problem." Indeed, a Beckman publication characterized these as the "two major loopholes" of the I.C. static check.

Plaintiff's invention, on the other hand, left the resistors and summing junction connections at the input side of the integrator undisturbed. As a result of reading the voltage which appears at the output of the converted amplifier, which, as previously explained, in fact amounts to a measurement of the integrator input, McCoy is able to check the input resistor network, the connections associated therewith, and, as well the connection from the summing junction to the input terminal of the converted integrator.

Accordingly, defendant's arguments that the limitations added to the claims in suit during their pendency in the Patent Office prevent them from covering the accused circuit are found to be unmeritorious.

### Validity

■ As previously noted, because of settlements reached in suits brought by plaintiff against two of the defendant's suppliers, the validity of claims 7, 8 and 13 is no longer contested by the Government. Defendant agrees that the validity of claims 7, 8 and 13 of the McCoy patent was fully litigated in *Reeves Instrument Corp. v. Beckman Instruments, Inc., supra.*

### Infringement

Plaintiff urges that the inventions covered by claims 7, 8 and 13 of the McCoy patent have been used or manufactured by or for defendant without license from plaintiff or lawful right. Plaintiff's petition states that analog computers manufactured for defendant by the following companies embody the invention as described and covered by the claims of the McCoy patent:

(a) Beckman Instruments, Inc. (its 1100, 2100 and 2200 series computers);

(b) Electronic Associates, Inc. (its models 16–231R, 16–221R, 680 and 8800, as well as some late versions of 16–24D, 16–31R and 16–131R);

(c) Applied Dynamics, Inc. (its model AD–2–64PBC);

(d) Comcor, Inc., a subsidiary of Astrodata, Inc.;

(e) GPS Instrument Co., Inc.; and

(f) Milgo Electronics Corp. (its model 4010).

By way of its amended answer, defendant denied that it had possession of sufficient information concerning the nature and extent of the "alleged infringement," but did admit purchasing systems from each of the above-listed corporations except Milgo Electronics Corp.

■ It is hornbook law that the claims of a patent set forth the formal definitions of the invention and must be looked to in determining if there has been infringement. *See Strumskis v. United States,* 474 F.2d 623, 200 Ct.Cl. 668 (1973), *cert. denied,* 414 U.S. 1067, 94 S.Ct. 576, 38 L.Ed.2d 472. However, while a claim cannot be limited or expanded to give a patentee something other than what is claimed, courts are not confined to the language of the claims in interpreting their meanings. *Young v. United States,* 204 Ct.Cl. 867, 179 USPQ 801, *cert. denied,* 419 U.S. 1002, 95 S.Ct. 322, 42 L.Ed.2d 278 (1974). Indeed, it is necessary, in construing the meaning of claims, to resort to the patent specification, its drawings and its file wrapper. *Autogiro Co. v. United States,* 384 F.2d 391, 181 Ct.Cl. 55, 155 USPQ 697 (1967). At the same time, claim interpretation should be done on a reasoned basis to avoid unjust results. *Emery Industries, Inc. v. Schumann,* 111 F.2d 209, 45 USPQ 12 (7th Cir. 1940).

With these guidelines and teachings in mind, we now consider whether plaintiff

has shown an infringement of any of the claims at bar. Initially, it is important to point out that the parties have stipulated that drawing X500C, which accompanies finding 49, is representative of the problem check systems incorporated in the accused computers supplied to the Government. Defendant argues that the claims do not read on the accused representative system because:

(1) they should be interpreted to cover devices which read the signals at the output of the integrator;

(2) the accused system does not disconnect the output of the integrator's operational amplifier from the rest of the closed loop as taught by the McCoy patent;

(3) the accused system disconnects the summing junction of the integrator from the input of the integrator amplifier during problem check; and

(4) the accused system uses a separate operational amplifier to measure the summing junction current during the test mode.

■ A number of these arguments have directly or inferentially been touched upon in dealing with defendant's file wrapper estoppel arguments. As discussed in considerable detail in findings 72 through 88, it is concluded that all of the elements of claims 7, 8 and 13 both literally and substantively are found in the representative accused system as shown by drawing X500C. Accordingly, the accused system is found to infringe claims 7, 8 and 13. However, the claims are not found to cover open-loop sections of a computer setup (*i. e.*, loops open during the computational mode of the computer). Moreover, the claims are not found to cover second and higher-order loops of computer setups where there is no shunt path around the additional integrators which would enable the test voltages to return to the integrator input.

### License Defenses

■ In addition to the defense of noninfringement, defendant also contends, under a series of related theories, that it has a royalty-free license under the McCoy problem check patent. Attention is now directed to defendant's contention of being licensed under the patent in suit as a result of the background patent rights clause of contract No. Nonr–378(01), later renumbered contract NOas 52–1142–c.

By way of background, the parties to this lawsuit entered into a series of contracts beginning at least as early as 1946, for analog computer-related projects. Specifically, on June 10, 1946, the Department of the Navy awarded Reeves Instrument Co. (hereinafter referred to as "Reeves" or "plaintiff") contract No. N60ori–128. This contract consisted of Task Orders I and II. Task Order I covered the development of a guided missile simulator and the operation of a simulation laboratory in which research and development on guided missile simulation was to be carried on. Task Order II called for the development and construction of a rapid and precise automatic analog computer suitable for detailed simulation of guided missiles. The development of this simulator was based on available computing devices and techniques used in fire control equipment.

Task Order II included the construction of prototype simulators capable of solving guided missile equations and a complete guided missile simulator. The guided missile simulator was to be capable of solving equations describing in detail the space trajectory and behavior of any missile under any type of control, while taking into account the motion of a target and the motion of a control point.

On June 12, 1947, Task Order III was added to contract N6ori–128 for the purpose of providing the Navy with a simulation laboratory, the Project Cyclone Laboratory, which was to be operated by the Reeves Analysis and Computer Group. To this end, the laboratory was to conduct guided missile simulator research and evolve techniques and methods for solving practical guided missile problems.

The development and construction of the prototype simulation equipment were completed in early 1947. The guided missile

simulator of Task Order II was completed in early 1949. With the satisfactory demonstration in February 1949 of the guided missile simulator solving a three-dimensional guided missile problem, Task Order II was substantially completed. Additional developments and modifications to the guided missile simulator after February 1949 were done under Task Order III.

In 1949, a new computing laboratory of REACs (an acronym for Reeves Electronic Analog Computer) was added to Project Cyclone under Task Order III. In addition, the older existing REACs, which were built in 1947, were modified to provide continuous automatic chopper balancing.

By 1951, the Navy had decided to modernize Project Cyclone by replacing the large, permanently connected ballistic computer with a laboratory consisting of REACs. The new REACs were procured under a separate Office of Naval Research contract No. Nonr–378(00)—Nonr–378(01). The parties have stipulated that the equipment was delivered, installed and accepted by the Navy by the end of 1952. With the transfer of cognizance of Project Cyclone on June 1, 1952, from the Office of Naval Research to the Bureau of Aeronautics of the Navy Department, Task Order III of contract N6ori–128 was renumbered NOas 52–1141–c, and contract Nonr–378(00)—Nonr–378(01) was renumbered NOas 52–1142–c.

Reeves was awarded contract NOas 53–383–c by the Bureau of Aeronautics for the continued operation of Project Cyclone in 1953. Also during 1953, an ELECOM 100 digital computer was added to the Project Cyclone Laboratory to perform check solutions for analog computations. In 1953, the Project Cyclone Laboratory consisted of three main laboratories. Laboratory 1 was equipped with new REACs funded under contract NOas 52–1142–c. Laboratory 2, which was set up to conduct test simulation, housed the original 1947 REAC. Laboratory 3 contained the ELECOM 100 digital computer and the REACs added in 1949.

In 1954, Reeves was awarded contract NOas 54–545–c by the Bureau of Aeronautics for the continued operation of Project Cyclone. By letter of October 11, 1954, in reference to contract NOas 54–545–c, Reeves proposed to convert Laboratory 3 to pre-patch, a removable plugboard arrangement. The proposal was approved by the Bureau of Aeronautics in a November 16, 1954, letter.

By letter of April 29, 1955, Reeves proposed to incorporate the problem check invention covered by the patent in suit in the Laboratory 3 computers at the same time that it was making the pre-patch installation. In addition, at the Navy's request, Reeves, on December 29, 1954, submitted a proposal for new equipment for Project Cyclone. Reeves' proposal included an enclosure, entitled "Specifications on Equipment," which was the preliminary specification for the new REAC C–400 computer and included a description of problem check. The problem check description was accompanied by a notation, "Patent Applied For." As of December 29, 1954, steps had been taken by Reeves to initiate the filing of a patent application on the McCoy problem check invention, but it had not actually filed an application in the Patent Office.

As a result of the December 29, 1954, proposal, as well as further negotiations between the parties, the Navy awarded Reeves supply contract NOas 55–603–f in 1955 for delivery of a REAC C–400 computer. By agreement of the parties, that contract did not contain a patent rights clause.

In 1955, Reeves was awarded contract NOas 55–571–c for the continued operation of Project Cyclone.

By March 1956, the patented problem check static test modifications had been made to the Laboratory 3 equipment of Project Cyclone under contract NOas 55–571–c. However, while the static problem check modifications had been installed by March 1956, the parties have stipulated that it was not necessarily operating as of that time.

Contract NOas 56–1089–c, which called for the continued operation of Project Cyclone, was awarded to Reeves in 1956.

During 1957, the oldest computer in Project Cyclone, dating back to 1947, which was housed in Laboratory 2, was replaced by a REAC C–400 computer. The computer was delivered under contract NOas 55–603–f, however, operation of the laboratory was done pursuant to contract NOas 56–1089–c.

Project Cyclone continued to be operated under Department of Navy contracts NOas 59–6215–c, NOw 60–0399–c and NOw 62–0149–c until 1962, at which time Government sponsorship of the project ceased.

*Defendant has no Rights under the Terms of Navy Contract NOas 52–1142–c*

The portion of the 1951 Navy contract NOas 52–1142–c, hereinafter sometimes referred to as "1142–c," which defendant introduced into evidence, contains the following Section H "Background Patent Rights Clause": [2]

SECTION H * * *

In addition to the rights granted to the Government in Section 29 of the contract, the Contractor hereby grants to the Government, under any patents now or hereafter issued with respect to which the Contractor now has or prior to completion or final settlement of the contract may acquire, the right to grant licenses without becoming liable to pay compensation to others because of such grant, the right to reproduce or to have reproduced articles or materials substantially the same as those delivered to the Government hereunder, and any modifications, or improvements thereof, and to practice or cause to be practiced processes developed in the performance of this contract, and to use in their entirety and dispose of in accordance with law articles or materials so reproduced.

The 1142–c contract, nominally designated as a research and development task order, called for the delivery of certain equipment, including a number of REAC C–101 computers, in order to modernize Laboratory 1 of Project Cyclone. The C–101 REACs were intended to replace the large permanently connected ballistic computers then in use. The C–101 REACs called for were substantially identical to the line of commercially marketed Reeves' computers, except that they did not have pre-patch capabilities.

Defendant does not urge that the McCoy invention was made under the 1142–c contract. Indeed, the problem check invention was never even installed on any of the REACs delivered to the Government under

---

**2.** In addition to the various other reasons for concluding that the Government is not licensed under the 1142–c contract, the ASPR instruction clauses which accompanied Section H (ASPR Clause 9–107.3) show that the clause was intended to provide the Government with reproduction rights to background patents and not to subsequently made improvement patents:

"9–107.3. *Reproduction Rights under Background Patents.* The grant of a license or title to the Government under foreground patents, as hereinabove in this part set forth, does not give the Government a free right to practice such foreground patents if the contractor owns or has control of a dominant background patent. It is therefore proper and desirable in the case of certain research or development contracts that the Government should obtain, under certain equitable circumstances as hereinafter set forth, a reproduction right (a limited license right) under such background patent or patents in addition to title or license under foreground patents as provided in paragraphs 9–107.1 and 9–107.2 above. Thus, reproduc-

tion rights should be obtained where there are benefits to the contractor, such as those set forth below, and where it is believed that the manufacture or use of the subject matter of the contract, or parts, modifications or improvements thereof, will involve the practice of inventions covered by contractor's background patents. The contract price should not be increased by reason of the acquisition of such reproduction rights."

\* \* \* \* \* \*

Moreover, ¶ 9–101.4 of the ASPR defines background patent in the following manner:

"9–104.4. *Background Patent.* The term 'background patent' means a patent, other than a foreground patent, based upon inventions which relate specifically to the manufacture, construction, or use of the subject matter of the contract and under which the contractor has acquired, or prior to completion or final settlement of the contract may acquire, the right to grant a license without obligation to pay compensation to others solely on account of such grant."

the 1142–c contract. Rather, defendant attempts to argue that the problem check invention of McCoy represents an "improvement" within the meaning of Section H, and that defendant should, accordingly, be granted a license under the McCoy patent. Thus, defendant first points to the work provisions contained in the February 1, 1953, contract NOas 53–383–c and the April 30, 1954, contract NOas 54–545–c, see findings 114 to 117, as evidence of the interest by the Government to insure the validity of the solutions obtained from the REACs used in Project Cyclone. Building on that premise, defendant next contends that the 1142–c contract was not terminated until midnight of June 30, 1955. Finally, defendant notes that the McCoy patent was filed in the Patent Office on April 20, 1955.

On the basis of the above, defendant argues that the McCoy invention is an improvement which was made before the alleged June 30, 1955, termination date of the 1142–c contract and thus comes within the terms of the Section H provision.

Defendant's argument fails for a number of reasons. In the first place, defendant has failed to provide the court with a complete copy of the 1142–c contract. It should be recalled that originally that contract was designated as Nonr–378(00)—Nonr–378(01). The 378(00) portion allegedly contained the basic terms of the agreement, while the 378(01) portion was a task order. Defendant has failed to submit any of the 378(00) section of the contract. Defendant shrugs off the absence of that portion of the contract on the grounds that it only intends to rely on the 378(01) task order. However, not only was the 378(01) task order introduced into evidence incomplete, but the record shows that the record copy has been constructed from at least two different sources. Plaintiff thus argues that:

> In view of this state of affairs and the fact that provisions found in one section of a Government contract are frequently amended or even deleted by language in other sections * * *, there is clearly no rational basis for determining just what provisions existed in the actual contract.

A review of relevant authorities indicates that complete contracts do not have to be introduced into the record in all circumstances.[3] However, the cases in which incomplete contracts have been introduced and relied on have required supplemental testimony to show that the missing portions were insignificant and/or had no impact on the issues at bar.[4] In the instant case, no testimony has been received to show that later amendments did not modify the Section H clause upon which the Government here relies.

However, defendant's arguments concerning its reproduction right under the McCoy patent on the basis of Section H fail for another reason. Specifically, Section H, in pertinent part, provides that the contractor grant—

> * * * to the Government, under any patents now or hereafter issued with respect to which the Contractor now has, or prior to completion or final settlement of the contract may acquire, * * * the right to reproduce or to have reproduced articles or materials substantially the same as those delivered to the Government hereunder, and any modifications, or improvements thereof, * * *.[5]

The basis for the Government's assertion that the 1142–c contract was not completed until June 30, 1955, appears to be a June 21,

---

3. " * * * the * * * destruction of the instrument generally has merely the effect of a loss of primary evidence which may be remedied in an action at law by the use of secondary evidence."

13 Williston, A Treatise on the Law of Contracts, § 1599 (3rd ed. H. E. Jaeger 1970); cf. 7 Wigmore, Evidence, § 2105 (3rd ed. 1940).

4. The opportunity was given to defendant during trial to bring forth any other evidence or testimony to establish the totality of the contract, but defendant did not avail itself of that opportunity.

5. Plaintiff also argues that it did not have any rights under the McCoy patent to grant to the Government prior to completion of the contract because that patent did not issue until 1961 and this was long after even the June 30, 1955, completion date urged by defendant.

1955, form letter of inquiry that was required by the Department of Defense's Appropriation Act of 1955. That letter points out that the inquiry was made because the 1142–c contract had not been certified for continuance beyond June 30, 1955, and that the Appropriation Act required termination as of that date for all contracts financed under certain annual appropriations. A reading of the June 21, 1955, letter, and particularly the following language, indicates that the letter was merely a form letter which cannot be taken to establish that the 1142–c contract was terminated on June 30, 1955:

Accordingly, you are hereby notified that to the extent of the items and/or lots under Contract NOa(s) 52–1142–c * * * *such items and/or lots not completed as of midnight 30 June 1955 are hereby terminated as of such date* * *. [Emphasis added.]

This language clearly shows that the purpose of the letter was to generally deal with uncertified contracts that would not be completed before June 30, 1955, or had not been previously completed. It certainly does not preclude the possibility that the 1142–c contract had been completed prior to the June 30, 1955, date.

Moreover, if the 1142–c contract had been terminated by the June 21, 1955, letter, plaintiff would have submitted certain contract related information required by that letter. Specifically, the letter required:

You are requested to notify the Contracting Officer in detail as promptly as practicable after 30 June 1955 of the status of performance of items and/or lots affected by this termination, including information setting forth the extent of completion and an estimate of the termination claim, if any.

There has been no showing that plaintiff made a claim as a result of the "termination," nor has defendant introduced any of the detailed information requested in the event that the June 21, 1955 letter had served to terminate the 1142–c contract.

To the contrary, the trial record indicates that plaintiff completed the 1142–c contract

long prior to the June 30, 1955, date urged by defendant, and probably by late 1952. This is not only shown by the testimony of record, see finding 110, but also by a stipulation entered into by the parties. That stipulation provides:

6. In 1951, it was decided to modernize the operation of Project Cyclone by replacing the large, permanently connected ballistic computer with a laboratory consisting of REACs. This new equipment was procured under a separate contract Nonr–378(00), Nonr–378(01) awarded to Reeves Instrument Corporation by the Office of Naval Research. The equipment was delivered, installed and accepted by the end of 1952.

The record thus establishes that the McCoy patent filing date of April 20, 1955, is long after the completion date of the 1142–c contract. Accordingly, even assuming that the Section H background patent rights clause was to be applied to a situation such as the one at bar, it is concluded that the plaintiff did not have, prior to completion or final settlement of the 1142–c contract, any rights under the McCoy patent. Thus, defendant is not entitled to any reproduction rights under the McCoy patent.

### Defendant is not Licensed Under the McCoy Patent as a Result of Terms of Navy Contract NOas 54–545–c

Defendant next argues that it has an express license to practice the inventions disclosed and claimed in the McCoy patent by virtue of the terms of the patent rights clause contained in its 1954 Navy contract NOas 54–545–c, hereinafter referred to as "545–c," with plaintiff. As previously explained, the 1954 contract was one of a series between the parties which continued the operation of the Project Cyclone facilities. Defendant couples the work statement and the subject invention clauses of the 545–c contract with the argument that McCoy is a "Technical Personnel" as defined by that contract, to urge the conclusion that it is licensed under the patent in suit. Defendant leans heavily on the

decisions of this court in the cases of *Mine Safety Appliances Co. v. United States,* 176 Ct.Cl. 777, 364 F.2d 385 (1966), and *Technitrol, Inc. v. United States,* 194 Ct.Cl. 596, 440 F.2d 1362 (1971), for legal support. However, as will become apparent, the facts of the case at bar dictate against reaching a similar result.

While defendant points out that in some instances the work to be done under the contract was designated as research and developmental, a comparison of the 545–c work statement with the work statements of predecessor Project Cyclone contracts illustrates that important changes had occurred between the granting of the 1946 Project Cyclone contract and the 1954 contract in question. Furthermore, in order to appreciate defendant's argument, it is necessary to reemphasize the importance to analog computer users in having some assurance of the accuracy and validity of the results obtained. This problem was a recurring one that had plagued analog computer users from at least as early as 1946, the inception date of Project Cyclone.

This consideration was equally important to Project Cyclone, since, as established from a review of the various contracts involved in this case, as well as the proof of record, it is concluded that its main purpose was to enable defendant to avail itself of plaintiff's expertise in solving complex problems through the use of simulation equipment. It thus comes as no surprise that concern for the validity of the results

obtained should find its way into some of the early contracts between the parties. Looking first to Section A of the Task Order III portion of N6ori–128, plaintiff was required to "* * * take all necessary steps to insure the validity of computer results." By 1949, that clause [6] was expanded to read as follows:

(v) *Validity of Results.* The Contractor shall take necessary steps to insure the validity of conclusions reached by application of the Simulator to research problems. *The Contractor shall conduct research to evolve the most efficient methods of checking research problems* and will apply such methods as adequately as possible to all research work conducted by the Contractor. The results of such checking procedures shall be reported by the Contractor in the Post Analysis report on each research problem. [Emphasis added.]

In accordance with that mandate, plaintiff hired Professor F. J. Murray as a private consultant to assist the Project Cyclone personnel in conducting an intensive investigation into error analysis techniques.[7] In addition, an investigation was made to determine if digital computers could be used to provide independent digital solutions to the assigned problems. As a result, plaintiff recommended that the Navy purchase a digital computer for use in checking the solution to simulator problems.[8] The recommendation was fol-

---

6. Section A(d)(v) of Amendment No. 6 to Task Order III of February 10, 1949.

7. Defendant does not contend, nor does the record indicate that Rawley D. McCoy participated in any of the research and development work carried out by Project Cyclone pursuant to Clause v of the 1949 contract.

8. *See* letter from Commanding Officer and Director to Chief, Bureau of Aeronautics, dated September 4, 1951, which states in pertinent part:
 "1. For the past several years, it has become increasingly apparent that large scale analogue simulators must be provided with an adequate means for checking the correctness of programming and the accuracy of solution for

practical design and test problems. This Center has conducted a series of theoretical analyses, practical investigations, and surveys to determine: (1) the need for checking facilities; (2) the type of facilities needed; and (3) the availability of such facilities. Mathematicians and engineers of this Center and of the Cyclone Simulation Laboratory, together with the Center's consultant, Professor F. J. Murray, of Columbia University, have jointly investigated the problem. In accordance with the discussions of reference (a), the resulting recommendations by this Center are:
 "a. That the Cyclone Laboratory should be provided with a small scale digital computer of moderate complexity, speed, and cost."

lowed[9] and in 1952 an ELECOM–100 digital computer was procured from the Underwood Corporation under Navy contract NOas 52–869–f.

While both the 1953 contract, NOas 53–383–c, as well as the 545–c contract continued to set forth the requirement that plaintiff "take necessary steps to insure the validity of the solution to simulator problems," those contracts no longer authorized any research into problem checking. The testimony of record is compatible with the above analysis and is totally devoid of any post-1952 showing that either the Navy or plaintiff was concerned with the development of new techniques for the checking of problems on Project Cyclone.[10]

The use of the ELECOM–100 computer at Project Cyclone is the only reasonable explanation for the absence of provisions calling for research into the checking of analog computer solutions in both the 1953 and 1954 contracts. Indeed, the record makes it abundantly clear that the ELECOM–100 was successfully used for that purpose and found to be ideally suited for the task of supplying independent check solutions prior to the running of problems on the analog computer. The undisputed testimony establishes that Project Cyclone personnel believed that the ELECOM–100 was providing the best available checking techniques to insure the validity of the analog computer solutions.

The above analysis clearly highlights that the parties had completed research to their mutual satisfaction in the area of problem checking well before the NOas 54–545–c contract was entered into.

Ignoring all of the above dealings between the Navy and plaintiff, defendant argues that the Section C, Item 1(e), provision, which required plaintiff to take necessary steps to insure the validity of the solutions to simulator problems, along with the following Section C, Item 3, requirement, establishes that the invention covered by the McCoy problem check patent comes within the research work called for by the 545–c contract:

> Item 3. The Contractor shall make necessary modifications and improvements to existing equipment and shall develop, construct and furnish hereunder such additional equipment as may be needed to efficiently solve assigned problems; *provided, however,* that the contractor obtains authorization from the Bureau of Aeronautics in writing prior to the development, modification or construction of equipment hereunder.

A review of findings of fact 113 to 118 makes clear that the Section C, Item 3, and Section A, Item 1(e), provisions, and their counterparts in prior contracts, were from the inception of Project Cyclone intended to cover auxiliary simulation equipment, such as plotting boards, function generators, output tables, etc., needed to efficiently solve assigned problems. That those provisions were not intended to authorize work in the area of problem check is clear from the fact that plaintiff had at least as early as 1952

---

9. The September 25, 1951, letter from the Chief of the Bureau of Aeronautics to the Director of Special Devices Center states:

"1. The recommendations of paragraph 1 of reference (a) that a small scale digital checking computer of moderate complexity, speed, and cost be ordered as soon as possible for the Cyclone Laboratory have been noted.

"2. The Bureau of Aeronautics concurs with these recommendations. Unfortunately, no funds have been provided for this procurement. However, the recommendations of reference (a) will be reconsidered at such time as funds become available."

10. Mr. McCoy's testimony on this point is particularly enlightening for it shows that after Project Cyclone became fully operational and certainly following its modernization in 1952, that he regarded it as a fairly completely developed facility. He was unable to recall any requests from Project Cyclone for help in the checking of problems. On this point, he testified:

"I do not recall any incident after that time [1952] in which it was stated or suggested to me that the facility was having problems with checking. In fact, it was my understanding that Project Cyclone with its facilities and its ELECOM computer, had satisfactory means for dealing with this problem."

completed research on problem checking under another contract provision.[11]

Moreover, the Section C, Item 3, provision of the 1954 contract did not authorize plaintiff to make any modifications or improvements to existing equipment unless it had obtained " * * * authorization from the Bureau of Aeronautics in writing prior to development, modification or construction of the equipment hereunder." While defendant urges that the McCoy invention was made under the above provisions, no evidence is offered to show that any authorization by the Bureau of Aeronautics was given to plaintiff to conduct research and/or development leading up to the invention involved in this suit.

In view of the above, it is concluded that the 1954 contract did not contemplate nor require any research and development work in the field of problem check.

We next consider the patent rights clause, Article 36, of the 545–c contract, which provides in pertinent part:

(a) As used in this clause, the following terms shall have the meanings set forth below:

(i) The term "Subject Invention" means any invention, improvement or discovery (whether or not patentable) conceived or first actually reduced to practice either (A) in the performance of the experimental, developmental or research work called for under this contract, or (B) in the performance of any experimental, developmental or research work relating to the subject matter of this contract which was done upon the understanding that a contract would be awarded.

(ii) The term "Technical Personnel" means any person employed by or working under contract with the Contractor (other than a subcontractor whose responsibilities with respect to rights accruing to the Government in inventions arising under subcontracts are set forth in paragraphs (f), (g) and (h) of this clause), provided that such person, by reason of the nature of his duties in connection with the performance of this contract, would reasonably be expected to make inventions.

\* \* \* \* \* \*

(b) The Contractor agrees to and does hereby grant to the Government an irrevocable, nonexclusive, nontransferrable, and royalty-free license to practice, and cause to be practiced for the Government throughout the world, each Subject Invention in the manufacture, use, and disposition according to law, of any article or material, and in the use of any method; *provided, however,* that with respect to (i) any Subject Invention made by other than Technical Personnel, (ii) any Subject Invention conceived prior to any performance of this contract as set forth in paragraph (a) above but first actually reduced to practice in the course of any such performance, and (iii) the practice of any Subject Invention in foreign countries, the said license and other rights hereinafter provided shall be to the extent of the Contractor's right to grant the same without incurring any obligation to pay royalties or other compensation to others solely on account of said grant. Nothing contained in this paragraph shall be deemed to grant any license under any invention other than a Subject Invention. Any license granted herein shall not convey any right to the Government to manufacture, have manufactured, or use any Subject Invention for the purpose of providing services or supplies to the general public in competition with the Contractor or the Contractor's commercial licensees in the licensed fields.

Having concluded that research work in the area of problem check was not called for by the 1954 contract, it is enough to dispose of defendant's license argument by pointing out that defendant has failed to show that the McCoy invention was " * * conceived or first actually reduced to practice * * * in the performance of the experimental, developmental or research work called for under this contract * *. Thus, defendant has not shown that the

---

11. Section A(d)(v), Amendment 6, to Task Order III.

McCoy invention was a subject invention within the meaning of the contract.[12] However, it is not necessary to rest this decision on that basis alone, for defendant's contention fails for the equally important reason that it has done nothing more than broadly allude to various "connections" or "contacts" between McCoy and/or his invention on the one hand, and the 545–c contract on the other. As will be shown, defendant supplies no hard facts to support its suspicions.

Defendant's arguments concerning the relevancy of cases such as *Mine Safety* and *Technitrol* to the facts of this case are not convincing. As understood and simply stated, defendant's position appears to be that it is entitled to a license under any invention conceived or reduced to practice by a Government contractor if the invention in any way relates to the subject matter of the parties' contract. This court has made clear that the license rights clause in Government contracts will not be restricted to situations where every component of the invention has been discovered in the course of contract performance. The attitude of this court on that point is summarized in the following statement from *Technitrol, supra,* p. 619, 440 F.2d p. 1372:

> What *Mine Safety* teaches is that the issue of license *vel non* should be approached liberally by asking what the United States (acting for its taxpayers) can fairly be said to have purchased through its sponsorship of the contract project. The Federal Government has the right to use, royalty-free, those ideas, improvements, discoveries, and inventions—crystallized during performance of the federal contract—which have a "close and umbilical relationship" to the work and research funded by the United States. Having borne the expense of that effort, the public is entitled to enjoy the fruits without further charge. Accordingly, as we said in *Mine Safety,* "[i]t is fitting to read the license-grant of Section 17 * * * liberally, * * * and

not to confine it severely within a narrow compass."

In arguing that it should receive a license under the invention disclosed and claimed by the McCoy patent, defendant points out:

1. That defendant was funding an ongoing project that had begun some 8 years prior to the conception of the McCoy problem check invention;

2. That the incorporation of the invention into Laboratory 3 under the 1954 contract and its succeeding contracts goes far to show that the invention had a "close and umbilical relationship" as a whole with the Government-financed Project Cyclone; and

3. That McCoy was a "technical personnel" as defined by the 545–c contract and as such was an inventor or co-inventor of three patents under various Project Cyclone contracts, including the 545–c contract.

With regard to defendant's initial point, it has already been shown that the 1954 contract did not contemplate nor authorize research by plaintiff into the problem check area.

The fact that problem check was incorporated into Laboratory 3 under the 1954 contract is readily explained from the trial record. An April 29, 1955, letter from Mr. Bauer, plaintiff's director of Project Cyclone, to the Chief of the Bureau of Aeronautics, indicates that the McCoy invention was brought to defendant's attention by plaintiff and plaintiff volunteered to upgrade the Project Cyclone equipment at no cost to defendant. Specifically, the letter states in pertinent part:

3. Reeves has developed "Problem Check", a new way of checking problem set-ups, which promises to be particularly useful when applied at a large prepatch installation.

4. Since Laboratory No. 3 will be modified to prepatch it will be advantageous to use this opportunity to incorporate "Problem Check" especially since the

---

12. *See Mine Safety Appliances Co. v. United States,* 176 Ct.Cl. 777, 364 F.2d 385 (1966).

down-time will not be appreciably increased thereby.

5. The cost estimates in paragraph (2) will not be affected because of the addition of "Problem Check". We will therefore incorporate "Problem Check" with the prepatch installation.

It thus is clear that the incorporation of problem check into the Laboratory 3 computers was done at no cost to defendant.

A number of fundamental facts which persuaded this court to conclude that a close and umbilical connection existed between the invention covered by the patent in suit and the contract in the *Mine Safety* case, *supra*, are not present in this instance. In *Mine Safety*, one of the co-patentees, Dr. Charles F. Lombard, was assigned to work full-time on a Government-sponsored contract and his salary came almost entirely from Navy funds. Neither of these elements have been shown to be true in the case of Rawley McCoy.

Other factors, none of which have been shown by defendant to be present in this case, which played a significant role in shaping the results reached in *Mine Safety*, include:

(1) USC's (the contractor) acquiescence that the research relating to the development of the crash helmet (the invention at issue in that case) was covered by its Navy contract;

(2) The fact that both the Navy and USC anticipated and foresaw that protective gear would result from the knowledge gained from the contract; and

(3) The fact that work on the patented crash helmet was carried out by the co-patentees in close physical proximity (cheek-by jowl) to the work under the Navy contract.

Moreover, the fact that the co-patentees in *Mine Safety* would not have been able to make their invention but for the knowledge they gained from their work under the Navy contract also appears to have played an important part in the *Mine Safety* case.

In this case, the inventor, Rawley D. McCoy,[13] had a varied and impressive background prior to his employment by plaintiff in 1946. Mr. McCoy received a master's degree in engineering in 1937, and came to plaintiff as a senior engineer after serving five years at Sperry Gyroscope Co. While at Sperry, he gained extensive experience in servo-mechanisms, radar and gun control systems. Mr. McCoy was hired by plaintiff to work on a new fire control system. McCoy also participated in the development and construction of the first simulator equipment used on Project Cyclone.

After these initial assignments, McCoy experienced a dramatic rise through Reeves Corp.'s hierarchy.

In about 1950, McCoy was made a member of an engineering committee which supervised the engineering activities of plaintiff. A short time later, but still in 1950, he was appointed the chairman of the committee and assumed corporate as well as engineering duties. As a result of his corporate duties, he became involved in a wide variety of nontechnical time-consuming matters, such as labor disputes, hospitalization, union elections, etc. He also was responsible for supervising plaintiff's commercial REAC program.[14] Plaintiff, between the years 1948 and the early 1950's was the leading commercial manufacturer of analog computers. The record undisputably establishes that McCoy, except for a brief one- or

---

**13.** For his contributions to the field of analog computers and servo-mechanisms, Mr. McCoy was elected a fellow of the IEEE.

**14.** As will be developed in more detail in dealing with defendant's estoppel arguments, the evidence of record establishes that the problem check invention was conceived by McCoy in July 1954 when considering a response to the Department of the Air Force's request for sug-gestions in connection with the Wright-Patterson Air Development Center's analog computer, and, as well, when he was considering features to be added to plaintiff's new REAC C–400 line of computers. The record also shows that the problem check invention was reduced to practice by at least March 1955 by plaintiff's building of a REAC C–400 for the Farnsworth Co.

two-month period, occasioned by the unexpected resignation by the director of Project Cyclone in April 1952 which forced him to take charge of that project until a replacement was found, was not directly involved with Project Cyclone. As a result of McCoy's managerial duties, McCoy only exercised administrative functions with regard to Project Cyclone after 1950.

In explanation of defendant's argument that McCoy, individually or jointly, made inventions in 1953, 1954 and 1957 in connection with various Project Cyclone contracts, the record shows that these inventions were made as a result of his being consulted by personnel assigned to Project Cyclone.[15] In the three instances involved, and McCoy testified that there were only three instances in which he was approached for technical assistance with regard to Project Cyclone activities, plaintiff willingly reported the inventions to the Navy and defendant was granted a royalty-free license thereunder. It should be noted that the three patents all relate to auxiliary equipment for analog computers and, accordingly, would come under the modifications authorized by provisions of Project Cyclone contracts, such as Section C, Item 3, and Section A, Item 1(d), of the 545–c contract.

After becoming a vice-president in 1953, McCoy had overall responsibility over plaintiff's entire engineering division. Beginning in 1954, McCoy was engaged in the general administration of plaintiff's engineering department and, in addition to the typical managerial duties associated with such office, he had direct supervision of at least 14 technical programs. By mid-1954, plaintiff's engineering department included over 600 employees.

Of significance to this case is the fact that defendant cannot show that McCoy ever performed any duties in connection with the 1954 contract under which it claims a license right to his invention.[16] Moreover, defendant has not shown that any of McCoy's time was directly charged or his salary paid by any Project Cyclone contracts.

Also significant is the almost autonomous manner in which Project Cyclone operated. The independence of that project from plaintiff is evidenced by the fact that plaintiff's personnel assigned to that project communicated directly with the Navy for work assignments. In fact, Project Cyclone had its own director and staff who were directly responsible to the Navy for work to be done under any of the Navy contracts. Mr. Bauer, director of Project Cyclone from 1952 to 1961, reported to Mr. McCoy for purposes of salary and personnel coordination with plaintiff's engineering department only.

Accordingly, the facts which played such an important part in shaping this court's *Mine Safety* and *Technitrol* decisions are totally absent from the case at bar. To the contrary, the facts show that the McCoy invention was not conceived in the performance of the experimental, developmental, or research work called for by the 545–c contract. Defendant has also failed to show that McCoy was in any way involved in any of the work done by plaintiff under that

15. Mr. McCoy testified with regard to these inventions as follows:

 "Also on some occasions when Project Cyclone was assigned problems which they couldn't process because of lack of some special equipment, they would ask me how I thought about doing it. When they asked me, and if the problem was intriguing, I would think about it and try to work up a solution for them.

 "For example, I recall three instances of learning of difficulties of Project Cyclone with solving certain problems and of offering advice. One involved the need for a function generator sometime around 1953.

 "Another involved a requirement for electronic multipliers in the 1954 period.

 "A third involved a need for a special time delay apparatus sometime in or about 1957.

 "Throughout the entire '50s and thereafter, I was on the executive payroll and did not fill out any time cards. For this reason, and because Project Cyclone replied on such cards, I do not believe that any of my salary was charged to Project Cyclone during this period."

16. Thus defendant has not shown that McCoy was a technical personnel within the meaning of Article 36(a)(ii) of the 1954 Navy contract.

contract. It, therefore, must be concluded that defendant is not licensed under the McCoy patent as a result of plaintiff's 1954 Navy contract.

### No Estoppel Against Plaintiff

 Defendant next contends that plaintiff is equitably estopped, by its false representations and concealment of material facts, from denying that defendant has an implied royalty-free license under the problem check patent in suit. A proper understanding of defendant's contention requires a brief consideration of the dealings between plaintiff and defendant's Departments of the Navy and Air Force during the late 1940's and early 1950's.

The Air Force began operating an analog computer facility at Wright-Patterson Air Development Center, hereinafter referred to as "WADC," in 1948. As a result of a 1951 study, the Air Force decided to materially increase the size of its WADC analog computer facility. For reasons which are unimportant to the issues at bar, the procurement responsibility for this facility was transferred to a Mr. L. M. Warshawsky in 1954. After a review of the project, Mr. Warshawsky felt it would be to WADC's best interest to seek the assistance of outside experts. As a result, on July 6, 1954, WADC wrote to various analog computer manufacturers, including plaintiff. The July 6, 1954, letter stated in pertinent part:

1. The Air Force is considering investigation of the problem presented herein and is desirous of obtaining preliminary data for planning purposes. Any information furnished in response to this request will be used for planning purposes only. It is not to be construed that procurement action will necessarily follow, nor does the submission of requested data obligate the Government in any way. You are cautioned that the advice given by your organization may be used in writing a specification for future procurement; and therefore, it is not desirable to have proprietary information included in your discussion, unless it is clearly indi-cated that you consider such information to be of a proprietary nature.

\* \* \* \* \* \*

7. \* \* \*

d. Another consideration in a computer of the size envisioned is the problem of validity of solutions obtained. Such things as minimizing human and machine errors should be considered. Means of assuring the proper inter-connection of the elements of the computer such as by punched card programming or automatic verification of wired-up plugboards, should be investigated. Means of running fast check solutions should also receive attention.

In response to the letter, technical personnel from a number of commercial manufacturers, including Mr. Rawley D. McCoy, who was then a vice-president of Reeves, Mr. C. B. Dewey, also a vice-president of Reeves, and Dr. Louis Bauer, the director of Project Cyclone at Reeves, visited WADC on August 18 and September 8 of 1954. While the record is not clear as to what transpired at each of the meetings, it is not disputed that the plaintiff's representatives did make oral representations concerning the equipment and features that should be specified for the WADC computer facility. The oral recommendations for the proposed equipment included the problem check invention.

In addition, during at least one of the above two meetings, and possibly at both, written descriptions of the problem check invention were left with Mr. Warshawsky. The written material did not include any legends or notes that the problem check feature was the "proprietary information" of plaintiff. Nor did the written material contain any notification that a patent application on the problem check feature had been applied for.

Following the receipt of ideas from various manufacturers, and after obtaining approval to proceed with the procurement, WADC prepared a specification for the equipment desired. The specification, which was made a part of the January 13, 1955, request for proposal on Purchase Re-

quest 131, included a description of the problem check feature suggested by plaintiff. The paragraph of interest, 2.1.2.1.8, reads as follows:

As an overall check on the machine set up, scale factor settings and component functioning, a "Problem Check" mode of operation will be added to the normal Reset, Operate, Hold and Balance Check modes now in common use in differential analyzers. In one suggested implementation of this new mode, all integrators will be converted into summers by paralleling their feedback capacitors with resistors. At the same time the integrator outputs will be disconnected from the "out" terminals on the plugboard which will be fed, instead, by an adjustable voltage source such as a potentiometer. In this way voltages may be introduced into the set up statically causing output voltages to appear at every component. The integrator voltages will be the initial values of the derivatives. By means of the automatic scanning and printing equipment all these voltages may be recorded and checked at the desk by substituting the initial values of the integrators into the equations representing the problem. It is apparent that this powerful check could be performed on existing computers, but it is equally apparent that the time and labor is considerable, as is the additional possibility of operator errors.

A purchase request, including the specification and a January 13, 1955, cover letter, was sent by the contracting officer, along with an invitation to bid thereon, to a number of computer manufacturers, including plaintiff's predecessor in interest, Reeves. Reeves did not protest the inclusion of the problem check description in the WADC specification. After evaluation of the responses from the various computer manufacturers, Reeves was ultimately awarded Air Force contract AF 33(616)–3097 on June 1, 1955.

Defendant, in addition, grounds its estoppel argument on alleged false statements made by plaintiff to the Navy during negotiation of a 1955 supply contract for REAC C–400 computers and auxiliary equipment for Project Cyclone. The trial record indicates that as a result of a request by the Bureau of Aeronautics of the Department of the Navy, plaintiff, on December 29, 1954, submitted a proposal for new equipment for Project Cyclone. Appended to plaintiff's proposal letter was an Enclosure B which described the specifications for the new commercial REAC C–400 series computer. The enclosure indicates that Reeves had applied for a patent on the problem check invention. Defendant argues that as a result of plaintiff's statement the parties negotiated to exclude the patent rights clause from the contract which ultimately issued, Navy contract NOas 55–603–f, and that the clause would ordinarily have been " * * * included in the procurement of not yet fully developed equipment."

Defendant, on the basis of the above, argues that plaintiff is—

* * * guilty of concealing material facts as to their claim of proprietary subject matter in their disclosure of "Problem Check" to the Air Force while at the same time misrepresenting the true facts to the Navy in alleging that a patent had been applied for when in fact no patent had been applied for.

Defendant thus urges that plaintiff is equitably estopped to deny that defendant has an implied royalty-free license under the McCoy patent. Defendant's arguments are not persuasive for a number of reasons, and in order to fully develop these reasons, it is necessary to briefly review Mr. McCoy's duties at Reeves during the period relevant to this lawsuit.

Following his employment in 1946, Mr. McCoy was assigned to assist in a number of projects, including the development of equipment for Project Cyclone. Starting in the late 1940's and especially after he had become a member of the engineering committee in October 1950, his duties included supervision of the Reeves commercial REAC analog computer program. The program involved the development and marketing of Reeves' general purpose REAC computers. Mr. McCoy's duties included

the development of the very first commercial REACs, the C-101 series, during 1948 or 1949. The predecessors of the first commercial REACs were the d.c. computers of Project Cyclone. Between 1949 and 1954, Reeves developed the C-200, C-300 and C-400 series of REACs. Mr. McCoy has testified, and no evidence has been introduced into the record to dispute his testimony, that all engineering expenses incurred in the development of the REAC models after the C-101 series were borne exclusively by Reeves.

In early 1954, Mr. McCoy became concerned with Reeves' commercial REAC program. Reeves had been the leading manufacturer of commercial analog computers for the period from 1948 through the early 1950's. However, by 1954, competitors had made drastic inroads into Reeves' sales and its sales were in a serious decline. Therefore, in the first half of 1954, Mr. McCoy, in the hopes of revitalizing Reeves' sagging commercial market, initiated a program to develop a new line of computers. This new line eventually became known as the C-400 series.

In the summer of 1954, Mr. McCoy also learned of WADC's request for proposals for a large general purpose analog computer facility. In July of 1954, while working on Reeves' proposal, Mr. McCoy conceived the problem check invention. A written description of the invention was initially prepared at Mr. McCoy's request by Mr. Bernard Loveman on August 16, 1954. Mr. Loveman had transferred from Project Cyclone to Reeves' sales department in the summer of 1954 and was assigned to the marketing effort being carried out for the new REAC C-400 computers. Mr. Loveman testified that he learned of the problem check invention for the first time in 1954 from Rawley McCoy. Mr. Loveman further testified that the description was prepared by him for use in his marketing efforts for the new C-400 computer.

Mr. McCoy also disclosed his invention to Mr. Dewey and Dr. Bauer, the remainder of plaintiff's team who were slated to accompany him to WADC on August 18, 1954.

In addition to the one prepared by Mr. Loveman on August 16, 1954, written descriptions of the invention were prepared by Dr. Bauer, and, as well, by Mr. McCoy on September 2 and September 7, 1954. Mr. McCoy's September 2, 1954, description was to be used in a proposal to the Fort Worth Division of Convair. The September 7, 1954, description was written by Mr. McCoy in anticipation of a second meeting with Mr. Warshawsky at WADC on September 8, 1954.

As previously mentioned, plaintiff was concurrently preparing for the production of the C-400 series of computers. However, plaintiff's president required a firm order for at least one C-400 series computer before he would authorize the expenditure of funds to procure parts, materials and assign drafting and engineering labor to the project. As a result of Mr. Loveman's efforts, an order for the first C-400 series computer was obtained in November 1954 from the Farnsworth Co.

Construction of the machine began in December 1954, although it appears that a preliminary specification and a number of the components for the machine had been engineered before November 1954. The Farnsworth REAC C-400 was essentially completed in time to be shown at the March 1955 IRE show in New York. Mr. Loveman testified that he demonstrated the computer at the show and that the computer included both static and dynamic problem check circuits. He further testified that he used the static problem check feature of the computer to authenticate the programming of a simple problem at the IRE show.

With the above historical perspective, we now consider that phase of defendant's estoppel defense that is grounded on a concealment of facts for the Air Force. In order to work an estoppel on plaintiff, defendant must establish four necessary elements, see *United States v. Georgia-Pacific Co.*, 421 F.2d 92, 96 (9th Cir. 1970):

> Four elements must be present to establish the defense of estoppel: (1) The party to be estopped must know the facts; (2) he must intend that his conduct

shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury.

In this case, defendant has not shown that plaintiff intended to mislead defendant by failing to designate the problem check feature as its proprietary information or to inform it of plaintiff's intention to obtain a patent on the problem check invention. Moreover, plaintiff did not act in a manner which would reasonably lead defendant to believe that plaintiff did not intend to obtain patent coverage for the problem check invention. To support its position, defendant relies heavily upon the July 6, 1954, Warshawsky letter which cautioned that all proprietary information be clearly indicated because of WADC's possible use of the information in the writing of a specification for future procurement.

Defendant stresses that at no time during any of the discussions between Reeves' representatives and Mr. Warshawsky, nor in any of the written material left with Mr. Warshawsky, did plaintiff indicate that it had a proprietary interest in the feature known as "problem check." Clearly impressed by plaintiff's problem check feature, Mr. Warshawsky incorporated it into the work specification of the January 13, 1955, request for proposals of purchase request No. 131, which was sent to the major analog computer manufacturers of that time. In explaining his action, Mr. Warshawsky testified:

> I felt free to incorporate this feature in the specifications because it was my clear recollection that there was no mention made by Reeves' personnel of a pending patent application nor was there any restrictions placed on my using the idea in our specifications if I saw fit to do so.

Contrary to defendant's version of plaintiff's submission, Mr. McCoy testified that the disclosure to Mr. Warshawsky was done in a manner to emphasize that the idea originated with and belonged to Reeves. The difference between plaintiff's and defendant's versions may find its source in the language used in Mr. Warshawsky's July 6, 1954, letter. The letter cautioned against the inclusion of "proprietary information," a term of art in the intellectual property field. The term was used in 1951, as well as today, to mean information which originates with or is peculiarly within the knowledge of its owner, or those in privy with him, that is not available to the public and is protectable as a trade secret property right.[17]

Section 9–210(c) of the April 9, 1957, Armed Services Procurement Regulations, defined "proprietary data" as—

> * * * information concerning the details of the contractor's trade secrets or manufacturing processes which are not disclosed by the design itself in which the contractor has the right to protect the use by others.

The facts of record establish that McCoy had only conceived his invention in July of 1954, his reduction to practice not having occurred until sometime thereafter. Thus, serious doubt exists as to whether Reeves had a protectable "property right" at that point in time, for it is not at all certain when the "idea" was reduced to concrete form sufficient to enable plaintiff to call it "proprietary data." *Belt v. Hamilton Nat. Bank,* 108 F.Supp. 689, 95 USPQ 311 (D.C. 1952), *aff'd,* 93 U.S.App.D.C. 168, 210 F.2d 706 (1953). Courts are reluctant to elevate an untested idea to the status of a property right without some proof that the physical means for putting it to use exists. Sec. 2.02[1] Milgrim, Trade Secret (1974).

In addition, since one of the requisites of a trade secret is that the possessor take reasonable measures to protect its secrecy, it seems highly unlikely that plaintiff could have made a decision and set up the necessary internal program to maintain the feature as its proprietary information between

---

**17.** *See* Sec. 517 of the Mutual Security Act of 1951 (Pub.L. 165, 82d Cong.); *see also* Restatement of Torts, Vol. IV, Sec. 757 (1939); *Kewan-* *nee v. Bicron,* 416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974).

the time of McCoy's conception and the WADC disclosures.[18] In any event, the facts of record fail to show that plaintiff viewed the problem check feature as its proprietary information at the time of the August and September 1954 discussions and written submissions to defendant.

Indeed, the record does not indicate even as late as March of 1955, at which time plaintiff submitted its response to the January 13, 1955, WADC request for proposals, that plaintiff had set up an internal program to protect the problem check feature as its proprietary information. This is substantiated by Mr. McCoy who testified that he was aware that his discussions and disclosures to WADC could forfeit any trade secret rights plaintiff may have had to the problem check idea. He went on, however, to testify that he had no intention and did nothing to lead anyone to believe, that plaintiff was willing to waive its patent rights to the problem check invention as a result of the discussions and submissions.

Warshawsky, in his July 6, 1954, letter, did not ask to be advised of any patents or pending patent applications which the submitting parties had on any of their suggestions. Moreover, even if the letter had, plaintiff cannot be said to have concealed information from defendant since at the time of the August through September 1954 submissions plaintiff had neither a patent nor a patent application on its problem check feature. The record shows that an application on the device was not filed until April 20, 1955, and the patent did not issue until January 10, 1961.

Furthermore, interpreting the Warshawsky letter to require a disclosure of patents and pending applications would be incon-sistent with the established Government position to ignore such factors in evaluating submissions and carrying out negotiations for Government contracts. In fact, in 38 Comp.Gen. 276, 278 (1958), the Comptroller General has ruled that the availability of 28 U.S.C. § 1498 as a remedy for a patent owner requires the Government to accept advertised bids which are alleged to infringe a patent:

It is our view, however, that section 1498 appears clearly to constitute a modification of the patent law by limiting the rights of patentees insofar as procurement of supplies by the Government may be concerned, and by vesting in the Government a right to the use of any patents granted by it upon payment of reasonable compensation for such use. We believe that the statute is not consistent with any duty on the part of a contracting agency of the Government to protect the interests of patentees or licensees with respect to articles which it proposes to purchase, since the statute itself defines and provides an exclusive remedy for enforcement of the patentee's rights as to the Government. Any other interpretation would appear to us to impose an impossible burden upon Government procurement officials to determine the applicability and validity of any patents affecting any articles desired.

See also, 39 Comp.Gen. 760 (1960), and Richmond Screw Anchor Co. v. United States, 275 U.S. 331, 48 S.Ct. 194, 72 L.Ed. 303 (1928).

Defendant's argument fails for the additional reason that it has not shown how it has relied on plaintiff's conduct to its detriment.[19] Defendant leaves this necessary

---

18. *Shatterproof Glass Corp. v. Guardian Glass Co.*, 322 F.Supp. 854, 168 USPQ 212, 220 (E.D. Mich.1970), *aff'd*, 462 F.2d 1115 (6th Cir. 1972), *cert. denied*, 409 U.S. 1039, 93 S.Ct. 518, 34 L.Ed.2d 487.

19. Even assuming that defendant could make out an estoppel on the basis of plaintiff's alleged concealment of material facts, plaintiff would have at most been estopped from recovering for defendant's use of problem check in connection with the WADC analog computer.

There has been no showing that defendant relied upon plaintiff's acts to purchase any other computers incorporating problem check. *See generally,* 31 C.J.S. Estoppel § 150, and, specifically, *American Republic Corp. v. Houston Oil Co.*, 173 F.2d 728 (5th Cir. 1949), *cert. denied*, 338 U.S. 858, 70 S.Ct. 101, 94 L.Ed. 526; *Orr v. Mutual Life Ins. Co.*, 64 F.2d 561 (8th Cir. 1933). Moreover, since plaintiff was the supplier of the WADC facility, it cannot complain of defendant's use of the problem check invention at that facility.

element of its estoppel argument for our private speculation since no showing has been made on the point. To the contrary, the record shows that the Air Force was eager to obtain the best equipment that it could for its WADC computer facility and it seems highly unlikely that it would not have included plaintiff's problem check feature in its specification. This is evidenced from Mr. Warshawsky's own appraisal of the feature as "a unique and definite advance in the art." Thus, even if plaintiff had indicated that it then had or would seek a patent on its problem check invention, it is unlikely that it would have made any difference to the Air Force. The conclusion that the Air Force would not have been concerned about uncertain rights that plaintiff may or may not have been able to obtain as a result of a pending application finds further support from the fact that the Government has in this instance continued to purchase accused devices even after it learned of plaintiff's patent. In striking down a similar estoppel argument, this court said in *Alford v. United States,* 151 USPQ 416, 420 (Trial Div. Ct.Cl.1966), 179 Ct.Cl. 938, 945 (1967):

> Defendant contends that plaintiff should be estopped to deny the existence of a royalty-free license because he failed to inform the Navy in 1948 of his pending patent application that covered the subject invention, thus inducing the Navy to believe that any subsequent procurement of antennas substantially identical with the 1214 antenna would not involve a protected invention.

> First of all, Alford was under no contractual obligation to notify the Navy about any background invention. Nor did Alford have any role in the decision-making process to purchase the AS–768 antennas. It was not until 4 years after Alford delivered the 1214 antennas to the Navy that the Navy, unknown to Alford, began purchasing the AS–768 antennas. Alford cannot be charged with remaining silent while knowingly permitting the Navy to purchase the AS–768 antennas. It was not until 1958 that Alford, on his own, became aware that the Navy was

using antennas that were substantially identical to the 1214 antenna that he furnished to the Navy. Nor can it be said that the existence of a royalty-free license was material to the Navy's decision to purchase the AS–768 antennas, because the Navy continued to purchase the antennas after it was informed of the plaintiff's position. Defendant's license by estoppel theory is not sound.

Accordingly, it is concluded that defendant has not established that plaintiff is estopped to deny the existence of a royalty-free license because of the concealment of material facts from the Air Force during preliminary discussions concerning the WADC computer facility.

Defendant also contends that plaintiff falsely represented to the Navy that a patent had been applied for during negotiations leading to the award of supply contract NOas 55–603–f, and as a result defendant agreed to exclude " * * * the patent rights clause that ordinarily would be included in the procurement of not yet fully developed equipment." To begin, defendant cites no authority to support its position that a patent rights clause would be included in a procurement contract for "not yet fully developed equipment." Moreover, as has been persuasively explained by plaintiff, its December 29, 1954, letter was prepared by a layman who at the time of the proposal was aware of efforts being made by plaintiff to patent the problem check invention. Defendant introduced no evidence to show that the statement was deliberately made to deprive defendant of any rights and it is just as reasonable to assume that it was made out of an awareness of plaintiff's in-house efforts to have a patent application prepared on the problem check invention. Accordingly, the use of the phrase "patent applied for" appears to be nothing more than a good faith effort to alert defendant of plaintiff's intention to proceed with the preparation of an application to patent the McCoy problem check invention.

However, even assuming that the above act does amount to a false statement by

plaintiff, defendant's effort to establish the necessary elements of estoppel still falls short of the mark. Specifically, defendant has failed to show how it has relied on the statement to its detriment. Indeed, under the facts of this case, defendant would not have been entitled to any rights to the problem check invention even if it had included a patent rights clause in the NOas 55–603–f contract.

Looking to the facts surrounding the award of the '603–f contract, it should be recalled that plaintiff on December 29, 1954, submitted its letter of proposal, at the Navy's request. In the course of describing its C–400 computer, the proposal also described plaintiff's new problem check feature. The description included the notation that a patent to cover the problem check feature of the REAC C–400 computer had been applied for. In actuality, plaintiff did not file an application on the invention until April 20, 1955. However, as has been explained in considerable detail, specifications and drawings, as well as some components for the REAC C–400 series computers, were completed prior to November 1954. Further, after receiving its first order from the Farnsworth Co., plaintiff started building the first REAC C–400 in November of 1954 and, by March of 1955, had successfully demonstrated the ability of the static problem check circuit to authenticate the programming of a simple problem at the New York IRE show.

On the other hand, Navy contract NOas 55–603–f was not entered into until November 3, 1955, a date long after plaintiff's conception and reduction to practice of the invention. Therefore, even if defendant had included a standard patent rights clause in that contract, the clause would not have entitled plaintiff to any rights under the McCoy patent. Accordingly, defendant has failed to show that it was injured by the exclusion of such a clause and its estoppel argument necessarily fails.

In sum, claims 7, 8 and 13 of McCoy patent 2,967,997 are valid and the inventions covered thereby are found to have been used and/or manufactured by or for

defendant without authorization or license from plaintiff.

### CONCLUSION OF LAW

Upon the findings of fact and the foregoing opinion, which are made a part of the judgment herein, the court concludes as a matter of law that claims 7, 8 and 13 of United States Letters Patent No. 2,967,997 are valid and have been used and/or manufactured by or for defendant without authorization or license from plaintiff, that plaintiff is entitled to recover reasonable and entire compensation therefor, and judgment is entered to that effect. The amount of recovery will be determined pursuant to Rule 131(c)(2).