.

# United States Court of Appeals
# for the Federal Circuit

———————————

**RAYMOND E. MABUS, SECRETARY OF THE NAVY,**
*Appellant,*

**v.**

**GENERAL DYNAMICS C4 SYSTEMS, INC.,**
*Appellee.*

———————————

**GENERAL DYNAMICS C4 SYSTEMS, INC.,**
*Appellant,*

**v.**

**RAYMOND E. MABUS, SECRETARY OF THE NAVY,**
*Appellee.*

———————————

2009-1550, -1560

———————————

Appeal from the Armed Services Board of Contract Appeals in No. 54988, Administrative Judge Cheryl L. Scott.

———————————

Decided: February 4, 2011

———————————

DAVID A. HARRINGTON, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for

Secretary of the Navy. With him on the brief were TONY WEST, Assistant Attorney General, JEANNE E. DAVIDSON, Director, and BRIAN M. SIMKIN, Assistant Director.

ELAINE J. GOLDBERG, Jenner & Block LLP, of Washington, DC, argued for General Dynamics C4Systems, Inc. With her on the brief was JESSICA RING AMUNSON. Of counsel was MATTHEW E. PRICE.

_____

Before RADER, *Chief Judge*, and NEWMAN and MOORE, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* Moore.

Dissenting opinion filed by *Circuit Judge* Newman.

MOORE, *Circuit Judge*.

Appellant Raymond E. Mabus, Secretary of the Navy (Navy) appeals the final judgment of the Armed Services Board of Contract Appeals (Board) holding that General Dynamics C4 Systems, Inc. (General Dynamics) is entitled to damages. Because the Board abused its discretion by denying the Navy's equitable estoppel defense, we reverse.

## BACKGROUND

On September 4, 1998, the Navy entered into a contract with Motorola, Inc. (Motorola) for the development and delivery of Digital Modular Radios. A Digital Modular Radio (radio) is also called a "software radio" and allows a single computer to interface with a number of different radio signals that would typically each require its own receiving device. This was an indefinite delivery/indefinite quantity (ID/IQ) contract meaning that the Navy, after purchasing a contractual minimum, could

order additional radios at the contract price.  The contract included an "Ordering Clause" that stated:

> If mailed, a delivery order or task order is considered "issued" when the Government deposits the order in the mail.  Orders may be issued orally, by facsimile, or by electronic commerce methods only if authorized in the schedule.

J.A. 105.   The schedule did not authorize electronic transmission of orders.

The initial phase of the contract involved two contractors, Motorola and a competitor.  The government issued its initial delivery order (DO) by mail on September 8, 1998.  This DO satisfied the government's ordering obligation under the contract.  The contract included five option years.  Prior to exercising Option I, the Navy performed a "down-select," choosing Motorola.  As part of this down-select, the parties entered into a bilateral modification that specified the criteria for the down-select as well as anticipated quantities that the government would require under each option.  This modification also extended the times for exercising Options I-IV.  The modification did not extend the time for exercising Option V, so the last date for issuing any orders would be September 30, 2003.  Prior to down-select, the Navy issued DO2 and DO3.  It is unknown whether the Navy sent these by mail or email.  On November 30, 1999, the Navy issued DO4 via email.

As part of the down-select process, Motorola issued a revised proposal for lower prices throughout the option years.  Motorola prevailed in the down-select and the Navy exercised Option I on February 1, 2000.  The Navy then issued DO5 through DO7 via email.

Prior to exercising Option II, the parties entered negotiations to modify the terms of the contract. The Navy agreed to extend the higher prices of Option I through Option II. This was advantageous to Motorola who had been losing money on the contract and stood to lose more under the Option II prices. Following this agreement, the Navy exercised Option II on March 28, 2000. The Navy then issued DO8 via email.

On September 28, 2001, General Dynamics assumed the contract from Motorola with knowledge that it was not profitable. *Appeal of Gen. Dynamics C4 Sys., Inc.*, ASBCA No. 54988, 09-2 BCA ¶ 34150, 2009 WL 1464387 at 11 (Board Opinion). Although the Navy exercised Option III, it did not order any radios under that option. In 2002 and early 2003, the parties entered negotiations and General Dynamics asked the Navy to extend Option I pricing. The parties entered a bilateral modification on September 27, 2002, which did not extend Option I pricing, but did require the Navy to pay higher prices for repair parts. This modification also exercised Option IV. The Navy then issued DO15 for a number of radios via email.

For reasons that are not entirely clear, the parties continued to negotiate whether to extend Option I pricing after the exercise of Option IV. In addition to extending Option I pricing, General Dynamics also sought to delete from the contract the "HF waveform," an apparently costly waveform that the Navy had not yet ordered under the contract. No contract modification resulted from these negotiations and the Navy ordered HF waveforms via email as DO16. Board Opinion at 6. General Dynamics was "a little shocked" that the government ordered these HF waveforms because it believed that there was an agreement to delete this contract term. *Id.* However, the parties never executed a modification to this effect and

the Navy demanded delivery of the HF waveforms stating that "the contract, as written, remains in full force and effect." *Id.*

On September 10, 2003, the Navy exercised Option V. *Id.* at 7. The Navy then issued DOs 18-20 and 22-29 via email under the Option V pricing. On September 30, 2003, the deadline for ordering under the contract, General Dynamics contacted the Navy to inquire about DO21. The Navy confirmed that it "skipped" that DO and that it would not issue it.

General Dynamics did not want to accept DOs 18-20 and 22-29 at Option V prices. *Id.* Sometime in September or early October 2003, General Dynamics personnel began discussing ways to avoid filling these orders. *Id.* At this time, General Dynamics reviewed the contract and determined that the Ordering Clause prohibited emailing DOs unless authorized by the schedule and that the accompanying schedule did not allow for email delivery of DOs. *Id.* at 7-8. General Dynamics sent a letter to the Navy on October 6, 2003, stating that General Dynamics rejected DOs 17-20 and 22-29. The Navy responded that it considered the DOs valid and demanded that General Dynamics deliver. *Id.* at 9. General Dynamics argued that the DOs were not valid and construed the Navy's demand as direction to proceed under the Changes Clause of the contract. The Changes Clause requires a contractor to go forward with work even if it disputes the propriety of the Navy's request. *Id.* at 3-4.

Following the Navy's demand for performance, General Dynamics filed a claim with the contracting officer. The contracting officer denied this claim. General Dynamics appealed to the Board. The Board ruled that the Navy failed to send the disputed DOs in strict compliance with the contract, and they were thus invalid. The Board

further rejected the Navy's arguments regarding waiver and estoppel. The Navy appeals; we have jurisdiction under 28 U.S.C. § 1295(a)(10).

## DISCUSSION

We review the Board's legal determinations de novo. *England v. Sherman R. Smoot Corp.*, 388 F.3d 844, 848 (Fed. Cir. 2004). We will not set aside a factual determination of the Board "unless the decision is fraudulent, or arbitrary, or capricious, or so grossly erroneous as to necessarily imply bad faith, or if such decision is not supported by substantial evidence." 41 U.S.C. § 609(b). We review the Board's determination on equitable estoppel for abuse of discretion. *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992) (en banc).

Equitable estoppel requires:

(1) misleading conduct, which may include not only statements and actions but silence and inaction, leading another to reasonably infer that rights will not be asserted against it; (2) reliance upon this conduct; and (3) due to this reliance, material prejudice if the delayed assertion of such rights is permitted.

*Lincoln Logs Ltd. v. Lincoln Pre-Cut Log Homes, Inc.*, 971 F.2d 732, 734 (Fed. Cir. 1992) (citing *Aukerman*, 960 F.2d at 1028).

The Board analyzed estoppel under a different standard. Specifically, it determined that equitable estoppel requires that: "(1) [General Dynamics] knew the facts; (2) it intended that its conduct be acted upon or acted such that the Navy had a right to believe it was so intended; (3) the Navy was ignorant of the true facts; and (4) the Navy relied upon appellant's conduct to its injury," citing *Rel-*

*Reeves, Inc. v. United States*, 534 F.2d 274, 296-97 (Ct. Cl. 1976). It held that the Navy could not establish element (1), that General Dynamics knew the facts. Board Opinion at 15. Specifically, it held that the Navy could not establish that General Dynamics appreciated the contract's restrictions regarding email delivery during the term of the contract. It also determined that because the Navy is charged with knowing the contents of its contracts, it could not establish element (3), that the Navy was ignorant of the email prohibition. Based on the failure to establish these elements, the Board rejected the Navy's estoppel defense.

The Navy argues that the Board based its analysis on the wrong standard, and under the proper test, we should reverse. Regarding the first factor, it argues that General Dynamics misled it by filling orders for years before rejecting them based on the Ordering Clause. Regarding the second factor, the Navy argues that it clearly relied on General Dynamics' conduct by continuing to send DOs via email throughout the life of the contract. The Navy asserts that if General Dynamics had notified it earlier, before the end of the contract, then it could have re-issued the orders in paper form. Regarding the third element, it argues that it was materially prejudiced because it could not obtain the radios under the contractually negotiated Option V pricing.

General Dynamics does not dispute that the estoppel standard from *Aukerman* applies. Instead, General Dynamics argues that the Board's error is harmless because the analysis is essentially identical. It argues that the Board made factual findings regarding each of the equitable estoppel elements even without considering the proper test.

Regarding the first factor, General Dynamics argues that it did not engage in misleading conduct. Specifically, it argues that before exercising Option V, the Navy had always entered bilateral negotiations prior to exercising any option. It argues that the disputed DOs came by "unilateral command" of the Navy rather than after bilateral negotiations. It argues that this makes the disputed DOs distinct from the prior emailed DOs and that General Dynamics was thus justified in enforcing the strict letter of the contract. Further, it argues that it was not misleading to notify the Navy after the deadline for ordering because ten of the eleven disputed DOs arrived in the final 48 hours of the contract. It also argues that the Navy could not reasonably infer that General Dynamics would not assert its rights under the contract. Specifically, it points to the fact that the Navy made these orders under the lowest prices of the contract and that these orders came just after General Dynamics had attempted to avoid delivering the HF waveforms. It argues that the Navy "issued emailed delivery orders at its peril." Appellee's Br. 52.

Regarding the second factor, General Dynamics argues that the Navy did not rely on its conduct. It argues that the Navy's representatives admitted that they email DOs as a matter of course and that this was command practice. Further, General Dynamics points to an admission by the Navy that "General Dynamics didn't have anything to do with the decision . . . to issue Delivery Orders by e-mail." J.A. 1289-90. Finally, General Dynamics argues that the Navy has not changed this practice since the end of this case. It argues that all of this shows that, regardless of General Dynamics' conduct, the Navy would have issued email orders.

Regarding the third factor, General Dynamics argues that the Navy did not suffer material prejudice. It argues

that the Navy was "aggressive" in asserting its rights under the contract and, by exercising Option V, it was asking General Dynamics to take a huge loss. It also argues that the Navy improperly requested HF waveforms. It argues that the Navy did not order the number of radios expected early in the contract and attempted to exploit the much lower prices at the end of the option years.

As an initial matter, we agree with both parties that the Board failed to analyze estoppel under the correct legal test, the equitable estoppel test set forth in *Aukerman*. In light of the undisputed facts, applying the proper test for equitable estoppel, we reverse the Board.

Regarding the first factor, we agree with the Navy that General Dynamics' conduct was misleading. The Navy issued 28 DOs over the course of the contract. The first three of these DOs were issued by mail or by unknown means. The remaining DOs were all sent by email. General Dynamics performed on thirteen of these emailed DOs with no objection.[1] The contractor only objected to the final Option V DOs numbered 17-20 and 22-29.[2] The Board noted that General Dynamics continued to accept orders because it "wanted to continue to work with the Navy to make the state-of-the-art [radios]." Board Opinion at 15. This acceptance of email orders was misleading in light of General Dynamics' later change in course when it refused to accept the final disputed DOs.

---

[1] The contractor performed on emailed DO4 through DO16. There was a dispute regarding DO16, but it related to the HF waveform, not the method of delivery.

[2] DO17 is not part of this action. Appellant's Br. 4. The remaining eleven DOs numbered 18-20 and 22-29 are the subject of this dispute.

To the extent that the Board held that equitable estoppel could not apply because the Navy could not establish that General Dynamics knew the content of the contract (in particular that General Dynamics knew of the contract's restrictions on email), Board Opinion at 15, the Board misapplied the law and therefore abused its discretion. The knowledge at issue is not General Dynamics' actual knowledge of the contract terms, but rather its knowledge that it was accepting emailed delivery orders. *See Advanced Materials, Inc. v. Perry*, 108 F.3d 307, 311-12 (Fed. Cir. 1997) (holding that to estop the government from refusing to pay for an overrun, the government must know of the overrun, accordingly, knowledge of the contract as it pertained to treatment of overruns was not the focus of the knowledge required). It is undisputed that in this case General Dynamics was aware that it accepted and fulfilled delivery orders which it received via email.

General Dynamics argues that because the Navy refused to renegotiate the contract prior to exercising Option V, we should ignore its earlier acceptance of the emailed orders. There is, however, no record evidence to support General Dynamics' suggestion that it accepted DOs via email because of the negotiations or contract modifications. General Dynamics does not even suggest that the subject of emailing DOs was ever discussed in any of the negotiations. In fact, following Option IV, the Navy refused to modify the contract and ordered HF waveforms via email, DO16, and General Dynamics fulfilled that order. In the course of performance between the parties, emailing DOs and performance in accordance with those DOs was standard practice. The Navy had no obligation to renegotiate Option V or to offer to pay higher prices. As the Board found, General Dynamics assumed this contract with the knowledge that it was not a profitable contract. Board Opinion at 11. The undisputed facts

of record support only one possible inference – that the contractor accepted emailed DOs.

Regarding the second factor, reliance, the Navy clearly relied on General Dynamics' conduct. It issued orders throughout the life of the contract via email. The contractor never rejected emailed DOs or even mentioned the Ordering Clause mailing requirement. Had the Navy known of General Dynamics' intention to reject these final orders, it could have placed hardcopy orders in the mail. This would have satisfied the now-asserted Ordering Clause and avoided this dispute. General Dynamics argues that because email ordering was the Navy's standard practice, it would not have changed its behavior even if General Dynamics had asserted the Ordering Clause earlier. This is an absurd assumption; while email ordering may be the Navy's standard practice, there is nothing that prevents the Navy from issuing hardcopy orders when the contract requires. It is true that the Navy continues to email orders under other contracts, but General Dynamics failed to show that the Navy persists in sending email orders when the contract prohibits the practice and the contractor objects. General Dynamics failed to produce any evidence to show that in the circumstances of this contract, the Navy did not rely on its consistent acceptance of emailed DOs. All of General Dynamics' evidence goes to unrelated contracts where there is no evidence that the contractor objected to email orders. Because General Dynamics failed to produce any evidence to rebut the Navy's evidence of reliance, we hold that the Navy satisfies this element of estoppel as a matter of law.

To the extent that the Board held that the government could not establish equitable estoppel because the Navy cannot show that it was ignorant of the email prohibition in the contract, it erred as a matter of law and

thus abused its discretion. Again, the Board focused on knowledge of the wrong thing. The issue is not whether the government had knowledge that the contract, as written, had a prohibition against email, but rather whether the government was aware that General Dynamics intended to refuse future delivery orders if they were sent via email. The government would not be able to rely on General Dynamics' prior acceptance of emailed delivery orders if it was aware that General Dynamics intended to change that course of conduct. *See Advanced Materials*, 108 F.3d at 312 (stating that the party asserting estoppel "must not be aware of the true facts, i.e.*,* that no implied funding of the overrun was intended" – not focusing on what the party asserting estoppel knew about the contract requirement). Given that General Dynamics did not decide to refuse to accept email delivery orders until after the expiration of the ordering period, there was no way in which the government could have known that this was General Dynamics' intent. *See* Board Opinion FF 29, 47, 54; Board Opinion at 15. The government could not have known these "true facts." Based upon the undisputed facts, the government's reliance on General Dynamics' consistent course of conduct – acceptance of emailed delivery orders – is established.

Regarding the final factor, it is clear that the Navy suffered material prejudice due to General Dynamics' delayed assertion of its rights under the Ordering Clause. This prejudice is the Navy's inability to obtain radios under its contractually negotiated pricing. General Dynamics arguments are irrelevant to the issue of prejudice focusing only on the Navy's "aggressive" conduct during the course of the contract. Even if General Dynamics' characterization is accurate, which we do not conclude, all of the alleged "aggressive" conduct was allowed under the contract terms; contract terms that

General Dynamics accepted when it assumed the contract with knowledge that it was not profitable. Board Opinion at 11.

The government has satisfied the elements of our test for equitable estoppel. We hold that the Board abused its discretion in determining that General Dynamics was not equitably estopped from rejecting the disputed DOs based on the Ordering Clause. The Navy simply exercised its rights under the ID/IQ contract to order under Option V. While we understand that these terms were not advantageous to General Dynamics, they were the terms of the contract voluntarily assumed by General Dynamics. We refuse to allow General Dynamics out of this bargain based on the Ordering Clause that General Dynamics consistently ignored.

As an alternative basis for affirmance, General Dynamics argues that the doctrine of equitable estoppel should not apply to ID/IQ contracts where the Navy failed to make orders in exact accordance with the language of the contract. General Dynamics argues that, under *Dynamics Corp. of America v. United States*, 389 F.2d 424, 430 (Ct. Cl. 1968), issuance of a delivery order in an ID/IQ contract is equivalent to exercising an option. It argues that "it is hornbook law" that a party must exercise an option in exact accord with the contract terms. Appellee's Br. 28. It argues that, by emailing the orders, the Navy failed to meet the strict letter of the contract. General Dynamics claims that these delivery orders were equivalent to an option exercise, and as such, each stood on its own as a counteroffer to the original contract that General Dynamics was free to accept or reject. It argues that while it accepted the first sixteen orders, it was free to reject the final twelve. It argues that to apply estoppel would violate this well-founded principle of contract law.

The Navy responds that, while General Dynamics' statement of law regarding ID/IQ contracts may be correct, it need not preclude the application of the doctrine of equitable estoppel to this contract. It argues that, to the extent the orders were counteroffers, General Dynamics accepted the terms by delivering on the first emailed DO. Further, the Navy argues that we should not accept this argument because the delivery orders, while not in compliance with the Ordering Clause, were fully consistent with all other portions of the contract and "did not alter the contract price, made no change to delivery terms, and did not exceed permissible quantities." Appellant's Reply Br. 15.

We agree with the Navy that the doctrine of equitable estoppel may apply to an ID/IQ contract. While General Dynamics is generally correct regarding the law of option contracts, this does not preclude the application of this equitable doctrine. Although the contractor may have been free to reject the first emailed DO based on the Navy's failure to comply with the Ordering Clause, it chose to fill that order and at least twelve more. We hold that this course of conduct estopped General Dynamics in the context of this ID/IQ contract. We see no reason to exempt this contract from generally applicable equitable doctrines.[3]

**REVERSED**

---

[3] Because we hold that the Navy prevails on the defense of equitable estoppel, we need not reach its alternative basis of waiver.

# United States Court of Appeals
# for the Federal Circuit

————————————

**RAYMOND E. MABUS, SECRETARY OF THE NAVY,**
*Appellant,*

**v.**

**GENERAL DYNAMICS C4 SYSTEMS, INC.,**
*Appellee.*

————————————

**GENERAL DYNAMICS C4 SYSTEMS, INC.,**
*Appellant,*

**v.**

**RAYMOND E. MABUS, SECRETARY OF THE NAVY,**
*Appellee.*

————————————

2009-1550,-1560

————————————

Appeal from the Armed Services Board of Contract Appeals in No. 54988, Administrative Judge Cheryl L. Scott.

————————————

NEWMAN, *Circuit Judge*, dissenting.

In this contract between General Dynamics and the Navy's Space and Naval Warfare Systems Command, the Armed Services Board of Contract Appeals sustained the right of General Dynamics to refuse eleven Delivery Orders,

because the orders were not in accordance with the contract's requirement for written and signed orders placed in the mail. Seven of the Orders were placed one day before the end of the last option period, and three were placed on the last day of the last option period. J.A. 288-89. The Board held that General Dynamics has the legal right to rely on the contract terms for Delivery Orders, had not waived that right, and was not estopped from exercising that right.[1] My colleagues on this panel overturn the Board's holding and excuse the Navy's admitted non-compliance with the contract ordering terms, even as the Navy required General Dynamics to comply with all of the concededly non-complying Delivery Orders.

I respectfully dissent.

## DISCUSSION

The contract includes several clauses directed to how ordering is required to be done. The Ordering Clause includes the following condition for electronic commerce methods:

> (c) If mailed, a delivery order or task order is considered 'issued' when the Government *deposits the order in the mail.* Orders may be issued orally, by facsimile, or *by electronic commerce methods only if authorized in the Schedule.*

Ordering Clause, J.A. 105 (citing FAR 52.216-18 (1995)) (emphases added). The Schedule for this contract did not

---

[1] *Appeal of General Dynamics C4 Sys., Inc.*, ASBCA No. 54988, 09-2 BCA ¶ 34150, 2009 WL 1464387 (A.S.B.C.A. May 8, 2009) (*Board Op.*).

authorize electronic commerce methods. The contract requires that the Ordering Clause be followed:

> (b) Delivery or performance shall be made only as authorized by orders issued in accordance with the Ordering clause.

FAR Clauses, J.A. 101, incorporating by reference FAR 52.216-22 (1995). The contract provides that exercise of the contract options to produce and deliver specified items must be written, and signed by the Contracting Officer:

> (a) The Government may exercise options in whole or in part any time during the option periods set forth herein to require the Contractor to produce and deliver hardware items or provide services specified in the contract. . . . These options *shall be exercised if at all by written notice signed by the Contracting Officer*, transmitted to the contractor at any time during the option exercise period . . . .

Contract Clause H-5, J.A. 81 (emphasis added).

The Board found that General Dynamics was not estopped from relying on these contract provisions and refusing to accept these Delivery Orders, although General Dynamics had previously accepted electronic orders. The Board found the undisputed fact that electronic commerce methods were not authorized in the contract Schedule. *Board Op.* at 3, Finding of Fact (FF) 14. The Board found that the parties never discussed changing the requirements of the Ordering Clause, *id.*, FF 13, although there were many formal contract "modifications." During performance, modifications were made to various aspects of the contract, but not to these clauses. All of the modifications stated that other provisions "remain[ ] unchanged and in full force and

effect." *Id.*, FF 13 (internal quotation marks omitted). The Board held the parties to the terms of their contract; this court now holds otherwise.

The Board's ruling is fully supported by the law of contracts, by precedent for government contracts, by the Board's findings of fact and conclusions of law, and by the standard of judicial review under the Contract Disputes Act. Nonetheless this court, breaking new ground in government/contractor relationships, reverses the Board and holds that General Dynamics is equitably estopped from invoking the contract's ordering provisions.

When an appellate court overturns a decision of a Board of Contract Appeals, there must be sound ground to override that decision, in law or in equity. The Contract Disputes Act sets the standard for review of factual findings:

> notwithstanding any contract provision, regulation, or rules of law to the contrary, the decision of the agency board on any question of law shall not be final or conclusive, but the decision on any question of fact shall be final and conclusive and shall not be set aside unless the decision is fraudulent, or arbitrary, or capricious, or so grossly erroneous as to necessarily imply bad faith, or if such decision is not supported by substantial evidence.

41 U.S.C. §609(b); *see generally Erickson Air Crane Co. of Wash., Inc. v. United States*, 731 F.2d 810, 814 (Fed. Cir. 1984) ("This court has a very limited review of boards of contract appeals.").

The panel majority now redesignates some critical findings of fact as rulings of law, and thereby finds that the Board "abused" its discretion as a matter of law. The issue

of equitable estoppel is an equitable determination, based on underlying findings of fact. Findings as to what was "believed," "known," "intended," "aware," "implied," and "relied on," are surely relevant to equity, but they are quintessential questions of fact, not matters of law. No party argued otherwise. Nonetheless, the court now rules that the Board abused its discretion, stating that the Board's findings of fact are really rulings of law and thus subject to *de novo* determination by this court. Maj. Op. at 9-13.

My colleagues do not discuss the evidence supporting the Board's findings of fact as to the parties' understanding and intent and reliance. This departure from the standards of appellate review does not add stability to the Contract Disputes Act, and ignores our own admonition that "the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C. Cir. 1971)).

The Navy does not dispute that this contract requires that orders be in writing and signed by the contracting officer, and that electronic ordering is forbidden. Ten of the eleven rejected Delivery Orders were placed by email 0-1 day before contract expiration. Precedent is clear that when the contract is explicit as to the ordering terms, these terms are material. And precedent clearly demonstrates that the government requires rigorous adherence to contract terms, and that the Board and the courts have generally declined to provide equitable relief from explicit contract provisions. The application of this rule to contracts with the government is reflected in the understanding that contracts with the government can be changed only by formal "modification."

The Board made eighty findings of fact, sixty-two of which relate to the Board's decision that General Dynamics was not estopped from invoking the contract requirement that Delivery Orders must be in writing and signed. Thus the Board held the Navy to the terms of this contract. "A long line of our precedent has established that agreed-upon contract terms must be enforced," reflecting "the general rule of contract law that contracting parties must be held to their agreements." *Madigan v. Hobin Lumber Co.*, 986 F.2d 1401, 1403, 1404 (Fed. Cir. 1993) (rejecting contractor pleas for mitigation or other departures from the contract terms) (citing *Seaboard Lumber Co. v. United States*, 903 F.2d 1560, 1564-65 (Fed. Cir. 1990) (enforcing contractual waiver of both Article III and Seventh Amendment rights); *Do-Well Mach. Shop, Inc. v. United States*, 870 F.2d 637, 640-41 (Fed. Cir. 1989) (enforcing contractual agreement of a limitations period for presenting a termination claim); *McCall v. United States Postal Serv.*, 839 F.2d 664, 667 (Fed. Cir. 1988) (enforcing contractual waiver of right to appeal because "choice was knowing and voluntary"); *Broome Constr., Inc. v. United States*, 492 F.2d 829, 834 (Ct. Cl. 1974) ("The court must enforce a mutually agreed-upon contract according to its terms."); *Aragona Constr. Co. v. United States*, 165 Ct. Cl. 382, 390 (1964) (enforcing contractual provision requiring the contractor to comply with change orders of the contracting officer)).

In *Appeal of Mach II*, ASBCA No. 56630, 10-1 BCA 34357, 2010 WL 292734 (A.S.B.C.A. Jan. 12, 2010) the contractor sought to invoke equitable estoppel or waiver to obtain payment for an order fulfilled despite the absence of the contracting officer's signature, for the contractor had filled such unsigned orders in the past. Applying precedent, the Board held that the ordering clause required a signed order, and that although the contractor had been told that the contracting officer would "return a signed order," this

was not done, and the government was held not liable for payment. *Cf. Heath Constr., Inc.*, B-403417, 2010 WL 3491945 (Comp. Gen. Sep. 1, 2010) (rejecting the bidder's protest following a denial of its bid because although the bidder sent its bid by facsimile after the contract specialist informed the bidder that submitting bids by facsimile was acceptable and provided the bidder instructions on how to do so, the government's invitation for bids did not authorize bids to be submitted by facsimile).

The Board observed that: "The Navy has not directed us to any case in which waiver or estoppel has been applied in the event of an improper option exercise or improper issuance of a DO under an IDIQ contract that the contractor protested prior to performance." *Board Op.* at 14. Nor has the Navy offered any such case to this court. The court nonetheless finds that the government was not "aware" that General Dynamics intended to refuse the disputed Delivery Orders, and holds that the Board abused its discretion in refusing to permit the Navy to violate the contract based on ignorance of its terms. My colleagues thus depart from the proper standard of review, as well as from precedent. Both sides to a contract are charged with knowledge of their contract's terms. This is essential in contracts with the government, lest the procurement system fall into disarray. *See generally Maxima Corp. v. United States*, 847 F.2d 1549, 1556 (Fed. Cir. 1988) ("Neither the contractor nor the government can avoid its legal responsibilities by asserting ignorance [of the contract terms]."). And although the Navy faults General Dynamics for not attempting to change this contract term, Appellant's Br. at 18-19, this is a curious argument, for it is not clear why a contractor must act to change a provision that is for its benefit.

The Board reviewed the specific circumstances of this contract, in explaining its reasoning for holding the Navy to

the contract terms. The Board determined that the "lack of negotiations prior to electronic ordering is material in distinguishing the DOs at issue from the DOs pointed to by the government as evidence of the parties' past conduct." *Board Op.* at 15 (citing FF 40, 49). My colleagues do not comment on the Board's reasoning and findings. Instead, my colleagues criticize the Board for applying government procurement law and precedent to determine the question of estoppel on the facts of this case, my colleagues holding that patent infringement law and precedent of estoppel apply.

The Board applied *Rel-Reeves, Inc. v. United States*, 534 F.2d 274, 296-97 (Ct. Cl. 1976) and other government contract precedent, which analyze equitable estoppel under a four-part standard. As applied herein by the Board, the four predicate inquiries for equitable estoppel are: "(1) [General Dynamics] knew the facts; (2) it intended that its conduct be acted upon or acted such that the Navy had a right to believe it was so intended; (3) the Navy was ignorant of the true facts; and (4) the Navy relied upon [General Dynamics'] conduct to its injury." *Board Op.* at 15. Precedent illustrates the acceptance of this four-part analysis. *E.g.*, *Advanced Materials, Inc. v. Perry*, 108 F.3d 307, 311 (Fed. Cir. 1997) ("This court has set forth a four element test to establish an estoppel claim in this situation.") (holding that the government was not estopped from relying on a provision requiring timely written notice, despite oral notice and the contracting officers' written assurances); *JANA, Inc. v. United States*, 936 F.2d 1265, 1270 (Fed. Cir. 1991) (citing the four-part test, and holding that the government was not estopped to assert overpayments against contractor); *Am. Elec. Labs., Inc. v. United States*, 774 F.2d 1110, 1113 (Fed. Cir. 1985) ("Four elements must be present to establish an estoppel . . . ."); *Hughes Aircraft Corp. v. United States*, ASBCA No. 24601, 83-1 BCA ¶ 16,396, 1983 WL 7542 (A.S.B.C.A. Mar. 4, 1983); *Emeco Indus., Inc. v. United*

*States*, 485 F.2d 652, 657 (Ct. Cl. 1973); *United States v. Georgia-Pacific Co.*, 421 F.2d 92, 96 (9th Cir. 1970).

My colleagues fault the Board for analyzing equitable estoppel under this established four-part test, and rule that "a different standard" applies, namely, the three-part test stated in *A.C. Aukerman Co. v. R.L. Chaides Construction Co.*, 960 F.2d 1020 (Fed. Cir. 1992) (en banc). Maj. Op. at 6. *Aukerman* was a patent infringement suit between private parties, where this court considered which factual issues are relevant to whether a patentee is estopped from filing suit, after threatening infringement and then remaining silent for a time. The court in *Aukerman* was concerned with straightening out some conflicting precedent that "confusingly intertwines the elements of laches and equitable estoppel." *Aukerman*, 960 F.2d at 1042.[2] The court was not concerned with contract law or any contract provision, but with threats of litigation. Despite these differences, commentary has noted only a semantic difference between the three-part and four-part standards for equitable estoppel. *See* Dan B. Dobbs, *Law of Remedies* 85 & n.6 (2d ed. 1993) (explaining that lack of knowledge of the true facts by the party invoking estoppel is covered by reliance).

*Aukerman* has not been viewed as announcing a new general standard for equitable estoppel in all areas of fact and law, negating precedent discussing estoppel in govern-

---

[2]    The *Aukerman* decision overruled the holding in *Jamesbury Corp. v. Litton Industrial Products, Inc.*, 839 F.2d 1544 (Fed. Cir. 1988) that equitable estoppel required "(1) unreasonable and inexcusable delay in filing suit, (2) prejudice to the infringer, (3) affirmative conduct by the patentee inducing the belief that it abandoned its claims against the alleged infringer, and (4) detrimental reliance by the infringer," *id.* at 1553-54, for that holding confused laches with estoppel.

ment procurement. *See, e.g.*, John Cibinc, Jr., Ralph C. Nash, Jr. & James F. Nagle, *Administration of Government Contracts* 65-66 (4th ed. 2006) (reciting four-part standard); 1 John Cosgrove McBridge & Thomas J. Touhey, *Government Contracts: Law, Administration, Procedure* §4.100[1][b] (Walter A.I. Wilson, ed., Release No. 445 2010) (same). This court similarly did not proclaim otherwise, until today. Today the court holds that the application of the *Aukerman* estoppel criteria leads to a different result, imposing estoppel on General Dynamics and prohibiting it from relying on the contract provision governing the placement of Delivery Orders. Maj. Op. at 9.

There are differences between estoppel arising from written contract terms, and estoppel arising from threats of patent infringement. Estoppel is a doctrine of equity, with "[m]orality and justice" as its foundation. *Harvey Radio Labs., Inc. v. United States*, 115 F. Supp. 444, 449 (Ct. Cl. 1953). This court recognized in *Aukerman* that the estoppel doctrine "is not limited to a particular factual situation nor subject to resolution by simple or hard and fast rules." *Aukerman*, 960 F.2d at 1041. Nonetheless, the court now announces that *Aukerman* provides the "proper test for equitable estoppel" in procurement law. Maj. Op. at 9. Thus my colleagues rule that the Board erred in law, in holding that the four-part standard of *Rel-Reeves* applies, *id.* ("[T]he Board failed to analyze estoppel under the correct legal test . . . ."), and on this rationale my colleagues reject the Board's findings of fact. For example, the court now holds that the factual elements of knowledge and reliance do not require that General Dynamics knew the facts, and holds that the Navy is entitled to estoppel as long as it was not "aware that General Dynamics intended to refuse future delivery orders if they were sent via email." *Id.* at 10, 12. My colleagues reject—calling it a matter of law—the Board's ruling that the Navy is charged with knowledge of its con-

tract. Instead, the court holds—calling it a matter of law—that the contractor cannot rely on the contract Delivery Order provision unless it had informed the government, in advance, that it will rely on this provision. *Id.* at 10 ("The knowledge at issue is not General Dynamics' actual knowledge of the contract terms, but rather its knowledge that it was accepting emailed delivery orders."); *id.* at 12 ("The issue is not whether the government had knowledge that the contract, as written, had a prohibition against email, but rather whether the government was aware that General Dynamics intended to refuse future delivery orders if they were sent via email."). These irregular holdings that the government need not know the content of its contracts and the contractor cannot rely on a provision that is for its benefit, do not impart stability to government contracting.

The Navy argues that General Dynamics behaved misleadingly by failing to object to the Navy's violation of the prohibition on electronic communication. However, the Board found that the Navy did not rely on any conduct of General Dynamics with respect to acceptance of email orders, but issued the contested delivery orders after negotiations for the fifth option period had fallen through. The Board found that "CO Lopez admitted that [General Dynamics] had nothing to do with his or [the Navy's] decisions to send DOs by e-mail." *Board Op.* at 10, FF 60. The Board found that General Dynamics did not possess knowledge unavailable to the Navy, and that General Dynamics did not deliberately delay informing the Navy or "conceal[ ] any prospect that [it] might reject" these Delivery Orders. *Board Op.* at 8, FF 50. The Board's findings are fully in accord with precedent, and are not fraudulent or arbitrary or capricious or grossly erroneous or unsupported by substantial evidence. The Board's conclusion on the facts and premises of this case is within its discretionary authority

and in accordance with law, and requires affirmance. From the court's contrary ruling, I must, respectfully, dissent.